SHORTESS, Judge.
These consolidated cases arose after an electrical accident which occurred on November 20, 1979, on property owned by Gifford-Hill & Company, Inc. (Gifford) located in Tangipahoa Parish. Pearly C. Sib-ley (Sibley) was electrocuted as a result thereof, and Charles M. Gill was injured. Sibley’s surviving wife brought suit for wrongful death, individually and on behalf of her minor children. Sibley’s major children also joined as plaintiffs. Gifford had hired Sibley to fabricate and install a sand and gravel plant on its property near the Tangipahoa River. The Sibley plaintiffs made Gifford, its plant manager, Ike Jenkins, Jr., and Louisiana Power and Light Company (LP & L) defendants in this suit. Gill brought suit for his injuries against Sibley, Western World Insurance Company, Inc. (Sibley’s insurer), and LP & L. Gill, at the time of the accident, was an employee of Gifford. The Sibley plaintiffs settled their ease against Gifford and Jenkins shortly before trial. Gill settled his claim against Sibley and Western World before trial. These cases were subsequently tried against LP & L, the sole remaining defendant. The trial court found that the accident was caused through the fault of LP & L and Gifford and cast LP & L in judgment after giving it credit for one-half of the damages. LP & L has brought this sus-pensive appeal but did not make quantum an issue. It does strenuously contest the trial court’s finding it guilty of any fault which may have caused or contributed to this accident.
FACTS
In late April, 1979, after a Gifford plant was washed out on the Tangipahoa River, Ike Jenkins, Jr., began making arrangements for the construction of a new sand and gravel plant. The old plant had been on the east side of the river, but Gifford decided to erect the new plant on the west side of the river. One of the initial requirements was to redeploy the electrical facilities. Jenkins got in touch with Paul Donald Fontenot, an executive with Earl L. Martin, Inc., which was engaged in the electrical construction business. In August of 1979, Martin constructed a power line approximately 8800 feet long to Gif-ford’s new plant for $23,748.69. Fontenot testified that he received all of his instructions as to design specification, location, etc., from Gifford and based on that information, constructed a three-phase with one neutral system which carried a load of 13.8/23.9 MV amp rating. LP & L provided the electrical service but did not contribute in any way, nor was it asked to, in the planning, design or erection of this system. This system, some 1.3 miles in length, received its service from LP & L at a point of delivery adjacent to LP & L lines situated on U.S. Highway 51. Immediately adjacent to the point of delivery, Gifford had installed a knife-type switch mechanism which could be employed whenever Gifford desired to de-energize its system. At the point of the accident, the vertical clearance between the ground and the three-phase lines was designed to be 40 feet. Measurements taken after the accident indicated, however, that the actual ground-to-wire measurement was 38 feet and 10 inches.
Pearly C. Sibley, who did business as P.C.’s Welding Service, was hired by Jenkins to do the welding, fabrication and layout work for the plant and gravel plants. Sibley supervised and used Gifford employees to do the work. Pursuant thereto, Sib-ley fabricated at the site a large steel A-frame which measured 26 feet and 5 inches in height, 10 feet at the bottom and 6 feet at the top.[1] A concrete slab had been poured about a week earlier, and on the fateful morning in question, Sibley was to move the A-frame to the slab and fasten it to steel footings which had been embedded in the concrete. The frames when in place were the structural members for a sand classifier. The distance to be traversed was approximately 200 feet.
*686 It was foggy at 6:30 a.m. when the Gif-ford plant began its daily operations on November 20, 1979. Jenkins instructed Sibley not to begin any hoisting operations until the fog lifted. While Sibley and Jenkins waited, they accumulated slings for use in attaching the A-frame to the Gabon 150 mobile crane (cherry picker) which had been selected to move the frame to the slab. They discussed how Sibley would attach the frame to the cherry picker. They also discussed the power lines, and Jenkins admitted that he said the lines were approximately 40 feet high.[2] About 7:45 a.m., after hanging the frame on the cherry picker, they began to move the load. At that time Jenkins left to get some other material, and Pierre Mars, Jenkins’ assistant and plant foreman, remained to assist Sibley. Earlier, Mars suggested an alternate way of hanging the frame because he was troubled about the cherry picker being able to handle the weight considering the method Sibley was employing, but Sibley preferred his method.
Gill, a mechanic for Gifford, was not specifically involved in any other task that morning so was enlisted by Jenkins to help with the moving operations. Herbert Smith, the operator of the cherry picker, had been working near the river but was told by Jenkins to help Sibley. Smith, also, expressed concern about carrying the load in the manner Sibley chose but was told by Sibley to get down if he was afraid. Smith remained on the cherry picker which then began its journey toward the concrete slab. They moved approximately 160 to 180 feet, with Smith operating the cherry picker, Gill out front to the right and Sibley out front to the left, each holding the beam’s outside leg. Its inside leg was secured to the frame of the cherry picker. The cherry picker passed under the first phase of the line without incident. Then Sibley instructed Smith to stop and motioned him to boom left. When they resumed they were only 18 feet or so from their destination, and the accident occurred. Sibley was killed and Gill was burned.
No one witnessed the electrical contact with the boom. Smith’s vision was impaired by the boom and the beam. During the entire operation he had to rely on his flagman, Sibley. Gill was looking at Sib-ley. Mars was some 50 feet away, and Jenkins was further away.
Jenkins testified that he did not know if there had been contact between the line and the boom; that he heard a yell and ran to the scene; that when he got there, the boom had been lowered.
Gill testified that they were moving the H-beam,[3] with Sibley directing; that the cherry picker was moving very slowly; that the ground was smooth and there was no bouncing; that he knew there were wires in the vicinity but was not worried about them and did not even look upward because he did not think they would touch; that at the time of the accident he was holding the frame to give it stability and keep it from swinging back and forth; that he did not know if there was contact between the wire and the boom.
Pierre Mars’ deposition was introduced by stipulation. He testified that he suggested that Sibley rig the frame to the cherry picker in a different manner but Sibley refused; that shortly after the moving began, he heard commotion, ran over to Gill who told him he had been shocked; that he looked up and saw the boom; that he could not say exactly how far it was from the wires but that it was within four inches; that he could hear a buzzing sound; that Smith, the operator, was going “all to pieces” inside the cab; that he told Smith to lower the boom about a foot which Smith did; that when the boom was lowered, the buzzing ceased; that the boom never contacted the wires; that the boom came closer to the second wire than the first wire because a little rise in the ground was encountered as they proceeded toward *687 the slab, but the boom and the wire did not touch; that after the accident he checked the wire and could not see any scorched places.
Herbert Smith’s deposition was also introduced by stipulation. He operated the cherry picker on the morning in question. He testified that before the load was put on the boom, he commented that it was an awful lot of weight to be handled that way; that Sibley told him that if he was afraid to move it, to get down; that he could not see the wires from his position in the cab because the boom and the beam were in the way; that he looked to Sibley, the flagman, for directions and concentrated on him and the load; that his attention was directed toward maintaining control of the load; that he never thought about the wires; that the boom never contacted the wires because if it had it would have bothered the boom; that he felt nothing when it happened but knew something had gone wrong because he heard static from the wire.
THE TRIAL COURT’S FINDINGS OF FACT
The trial court stated in its Reasons for Judgment the following findings of fact:
“1) The boom of the crane never made actual contact with the wire. Instead, the late Mr. Sibley’s electrocution was caused by arcing of the electricity provided by L.P. & L. from the wire to the boom of the crane, most probably because of a surge of electricity at the critical moment when the boom was close to the wire.
2) The surge of electricity which caused the electrocution was caused by the equipment of L.P. & L.
3) The line was constructed by Earl Martin, Inc. in accordance with the initial design provided by Gifford Hill & Company.
4) The design of the line was unreasonably dangerous in two respects. First, it was located in such a manner as to cross the main roadway of the Gifford Hill plant where it could be dangerous to construction machinery, including booms of cranes, which would be used in the construction of the plant and which could only enter the construction area by means of that roadway. The line could have been designed and located in a different area or it could have been brought into the plant underground. Second, if the line was going to be located where it could interfere with the passage of cranes and other equipment, there should have been some means provided to shut off the electricity in the line at the job site rather than at a point several miles and twenty minutes travel from the job site.
5) The condition described above could have been prevented and/or eliminated at minimum expense and without affecting the supply of electricity.
6) Sibley was not negligent nor did he assume the risk of injury. The Court finds that he acted reasonably under the circumstances. He had been led to believe by Ike Jenkins, the Gifford Hill superintendent, that the line was approximately forty feet (40') above the road, so Sibley, who rigged up the A frame, reasonably felt it could pass safely under the line. In fact, the boom would have cleared the wire without any problem if the arcing had not occurred. Had the line in fact been forty feet (40') above the ground as Mr. Jenkins stated or had there not been an abnormal surge of electricity in the line, the electrocution would not have occurred.
7) Accordingly, the Court holds that Mr. Sibley’s death was caused by the combined fault of L.P. & L. and Gifford Hill. Since the Sibley plaintiffs have settled with Gif-ford Hill, defendant L.P. & L. is entitled to a credit in the amount of one-half of the damages.”
We have determined it necessary to consider only one issue raised on appeal by LP & L since it disposes of the case. , That issue is whether the trial court was factually and legally erroneous in its findings which attributed fault in this case to LP & L along with Gifford.
The trial court made two basic factual findings to find fault. Initially, it found that the accident was most probably caused because of a surge of electricity from LP & L equipment at the critical moment when *688 the boom was close to the wire. Second, it found that the Gifford lines were unreasonably dangerous. We will treat- each proposition separately.
A. The surge theory. The accident occurred at the second-phase wire. This means that the boom and its load successfully passed under the first-phase wire without incident. Plaintiffs’ expert, Robert Nethkin, was of the opinion that one of four things could have caused the accident under the second-phase wire when nothing happened under the first-phase wire. Three of the four reasons he ruled out, all of which required contact between the wire and the boom: (1) uneven ground, (2) bounce of the crane, and (3) different heights between phases. He zeroed in on his fourth explanation, that of a voltage surge on the second phase. A voltage surge is an unusual electrical phenomenon, usually thought of in connection with lightning. If lightning strikes a line, there can be a surge or an overabundance of electricity passing through the line. If the voltage is too great for the designed capacity of the line, it surges out of the line and seeks ground through any nearby object. The facts of this case rule out lightning. Another type of surge can occur with switching operations. If an operator at a utility company’s control point closes a line leading to one branch of service and opens a line somewhere else, this may cause line-to-line electrical intensities. The operator is in a position to control the voltage flow, so usually nothing remiss happens. Accordingly, the chances of a damaging switching surge were placed in the statistical range of approximately 200 to 1. With a surge comes the potential of electrical arcing to a greater degree than normal. Increased voltage on a line, together with the presence of metal in the vicinity of the line at the time of the surge, can have disastrous consequences. To pursue the surge theory, it of course becomes necessary to rule out contact or virtual contact between the line and the boom. Nethkin was of the opinion that no contact had been made. All of the lay witnesses at the scene felt that there had been no contact between the line and the boom. The trial court found that the boom of the crane never made actual contact with the wire. In this finding, it was not clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
Nethkin’s surge theory finds no direct evidence in the record to support it. The records of LP & L, including its voltimeter and switching log data, show no unusual surges from switching operations on the day in question and just prior to the accident. Nethkin felt, however, that a surge was the only explanation because if there had been contact with the line, he would have expected more physical damage to the bodies of Sibley and Gill, as well as scorching to either the boom or the line, or both. Plaintiffs must therefore rely solely upon circumstantial evidence in order to prevail against LP & L since there is no direct evidence of a surge. When a plaintiff relies upon circumstantial evidence, the jurisprudence has established the following test as restated in Weber v. Fidelity & Casualty Ins. Co. of New York, 259 La. 599, 250 So.2d 754, 757 (1971):
In this civil case, the plaintiffs’ burden is to prove causation by a preponderance of the evidence. This burden may be met either by direct or, as in this case, by circumstantial evidence. Jordan v. Travelers Insurance Co., 257 La. 995, 245 So.2d 151 (1971); Naquin v. Marquette Cas. Co., 244 La. 569, 153 So.2d 395 (1963).
As we stated in the latter decision, 153 So.2d [at] 397: “Taken as a whole, circumstantial evidence must exclude other reasonable hypotheses with a fair amount of certainty. This does not mean, however, that it must negate all other possible causes. Otherwise, the mere identification by the record of another possibility, although not shown to be causally active, would break the chain of causation.”
This accident could only have been caused by three things: (1) actual contact between the boom and the power line, (2) close proximity (within an inch) of the boom *689 to the line without actual contact, causing an electrical arc, or (3) proximity (several inches) of the boom to the line at the same time that an extra surge of electricity was in the line.
Mars was on the scene almost instantaneously. He heard the buzzing sound, saw the boom close to the wire, ordered Smith to lower the boom, and noticed that once the boom was lowered the buzzing sound ended. This testimony certainly adds weight to the theory of arcing because of close proximity.
The trial court was clearly wrong in finding that there was “probably” a surge of electricity caused by LP&L’s equipment. There was no direct evidence of a surge, and the same circumstantial evidence which points to a surge also points to close proximity arcing. Confined as we are to the record, it is impossible to say that more probably than not a surge occurred when it just as reasonably could have been close proximity arcing. Plaintiffs’ theory against LP & L requires a factual finding of a surge emanating “upstream” from Gifford’s lines and traveling to the line in question. Plaintiffs failed to carry this burden of proof by a preponderance of evidence.
B. The unreasonably dangerous design. Nethkin was of the opinion that the general provisions of the National Electrical Safety Code were violated in this case. Those general requirements provide that equipment shall be installed and maintained so as to reduce the hazards to life. He felt that there were two design defects in Gifford’s lines: (1) there was no quick way to de-energize the power lines from Gifford’s plant because the de-energizing switches were several miles away, and (2) the lines crossed over the road.
The trial court found the line to be in an unreasonably dangerous condition. “Unreasonably dangerous” is a term of art, and in an Article 2317/strict liability analysis, it is used to indicate the condition of a thing which gives rise to liability on the part of the owner or custodian of that thing for damage caused by it.
We first note a factual inapposition between this case and Hebert v. Gulf States Utilities Co., 426 So.2d 111, 114 (La.1983), and Kent v. Gulf States Utilities Co., 418 So.2d 493 (La.1982); namely, LP & L is merely a supplier of electricity to the offending power line. Gifford was the owner of the line. The test which has been applied to suppliers of electricity was restated in Hughes v. Louisiana Power and Light Co., 94 So.2d 532 (La.App. 1st Cir.1956), and has been cited as authority since that time. Therein, that duty was articulated to be as follows:
The duty and responsibility of a mere generating company is generally held to be limited to making a proper connection and delivering the electric current to the purchaser’s wires and appliances in a manner which, so far as such delivery is concerned, protects life and property, and there is no duty of inspection to see that the purchaser’s wires and appliances are in a safe condition and kept so. Accordingly, where wiring or other electrical appliances on private premises are owned and controlled by the owner or occupant of such premises, a company which merely furnishes electricity is not responsible for the insulation or condition of such wiring or appliances and is not liable for injuries caused by their defective condition, to such owner or occupant, * * *. [However,] “knowledge of the defective and dangerous condition of a customer’s appliances will charge even a mere generator and supplier of electricity with liability for consequences, where current is thereafter supplied to such defective and dangerous appliances, in which case it is the energizing of the line with knowledge of the conditions, and not the conditions themselves, which forms the basis of liability”, 29 C.J.S., Electricity, § 57, pp. 611-613. See also 18 Am.Jur.Verbo “Electricity”, Sections 46-53, 62, 85, 100.
Hughes, 94 So.2d at 535.
The trial court’s finding Gifford at fault is not an issue in this appeal. However, that finding as to Gifford cannot be used to *690 support the inference of a breach of the legal duty of LP & L, the supplier who had absolutely no knowledge or control over Gifford’s on-site operations.
The trial court was clearly wrong in finding LP & L guilty of any fault causing or contributing to the accident in this case.
CONCLUSION
For the reasons stated above, the decision of the trial court which found LP & L guilty of fault along with Gifford and casting it for one-half of the damages it awarded is reversed at plaintiffs’ cost.
REVERSED AND RENDERED.

. The legs of the frame were made of 12-inch diameter steel. The cross member was a steel I-beam which measured 14 feet x 7 inches.

. Two days earlier, Sibley had de-energized the lines when he moved the classifier to the concrete slab.

. Several witnesses referred to the beam as an H-beam.