WARD, Judge.
Ray S. Smith and Anthony Papania were severely injured when an aluminum pole they were holding made contact with electrical wires above them. Smith and Papania filed suit against Shell Oil Company, various insurers, and Louisiana Power & Light, and requested a jury trial. They amended their petition to name various contractors who designed and built the electrical poles and lines. Before trial their claims against Shell, the contractors, and various insurers were settled, and only their claims against LP & L went to trial before a jury. At the close of plaintiffs case, LP & L moved for a directed *1311 verdict, and the trial judge granted it. Smith and Papania appeal the verdict.
STANDARD FOR DIRECTED VERDICT
Campbell v. Mouton, 378 So.2d 237 (La.App. 3rd Cir.1979), set the standard for directed verdicts which has been recognized by other Louisiana appellate courts:
The motion for directed verdict is a common law procedural device which has only recently found its way into the law of Louisiana through Article 1810 of the Code of Civil Procedure. The purpose of the directed verdict is that “it serves judicial efficiency by allowing the judge to conclude the litigation (in a jury trial) if the facts and inferences are so overwhelmingly in favor of the moving party that the court believes that reasonable men could not arrive at a contrary verdict.” Civil Procedure Work of Louisiana Legislature for 1977 Regular Session, 38 La.L.Rev. 152, 157 (1977); See also Williams v. Slade, 431 F.2d 605 (5th Cir.1970).
The court, in Campbell, also approved the Federal standard, quoting Boeing Co. v. Shipman, 411 F.2d 365 (5th Cir.1969):
On motion for directed verdict and for judgment notwithstanding the verdict, that Court should consider all the evidence not just that evidence which supports the non-mover’s case but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury.
373 So.2d at 239.
Having adopted the above standard as our own, Armstrong v. Lorino, 580 So.2d 528 (La.App. 4 Cir.1991), we now consider appellants’- claim that the trial judge erred by granting a directed verdict in favor of LP & L.
SUFFICIENCY OF PLAINTIFF’S EVIDENCE
Reviewing the evidence in the light most favorable to the plaintiffs and drawing all reasonable inferences most favorable to them, we conclude that the defendants’ motion for a directed verdict was properly granted. The facts and inferences point so strongly and overwhelmingly in favor of Shell that reasonable and fair-minded men could not arrive at a verdict in favor of the plaintiffs.
The incident which gave rise to this suit occurred on May 14, 1986 at the Shell Oil Company grease plant located on Jefferson Highway. Plaintiffs, Smith and Papania, were employed by Be-Neat Tank Cleaning Company (“Be-Neat”). Shell hired Be-Neat to clean a grease tank located on its property. Be-Neat sent Smith and Papania to perform this task.
The grease tank was built by Shell in 1954 and had not been cleaned prior to the day of the accident. The tank was adjacent to a building, elevated from the ground. In 1985 Shell contracted with Carl E. Woodward, Inc. for construction of a new building, and Woodward through various subcontractors designed the electrical service to the building. The construction of the electrical feed system to the building was subcontracted to Highlines Construction Company. Highlines erected 70 foot poles and the feed electrical wiring was strung on these poles running from the rear of Shell’s property, parallel to Jefferson Highway but on Shell property. The electrical lines cleared the tank top by fifteen feet six inches and were located somewhat south of the tank, not directly overhead.
On the morning of the accident, Joe Ben-nitte, the owner of Be-Neat, a Shell safety man, and plaintiffs Smith and Papania climbed the tank to discuss the job and the tools to be used. They decided to use an impromptu rigged scraper and two aluminum poles tied together, which with extensions were 33' in length.
*1312 Plaintiff, Papania, was working closest to the tank hole and his duty was to guide the device into the tank. At the same time, Smith was positioned behind Papania and his duty was to insure that the scraper did not contact the power lines. Unfortunately, after only about 90 minutes of cleaning the tank, the aluminum scraping device made contact with the power lines and, thus, plaintiffs were severely injured.
Plaintiffs’ suit is based on the theory that the power lines were designed to be located too close to the grease tank. Plaintiff argue that LP & L is liable for plaintiffs’ injuries because they “knew or should have known” that the lines were unreasonably dangerous, and that case law imposes a duty on LP & L not to transmit electricity over unreasonably dangerous wires.
The Supreme Court in Sibley v. Gifford Hill & Co., Inc., 475 So.2d 315 (La.1985) declared that:
LP & L, as a public utility company engaged in the distribution of electricity, had a duty not to supply power across a private transmission line which it knew or should have known was unreasonably dangerous.
475 So.2d at 319. (Emphasis added). Thus, Plaintiffs must prove both knowledge or constructive knowledge and an unreasonably dangerous transmission line, and we conclude the trial court correctly granted a directed verdict because neither knowledge nor unreasonably dangerous transmission lines was proven, and reasonable men could not arrive at a contrary verdict.
First, to consider whether there was knowledge, either actual or constructive, Plaintiffs attempted to prove constructive knowledge by claiming that LP & L employees visited the Shell plant and that LP & L had metering facilities in close proximity to the Shell plant. But LP & L’s responsibility for design and construction of electrical wires ends at the meter and even if their employees read the meter and visited the plant, that is not sufficient to charge LP & L with knowledge that the lines were unreasonably dangerous.
Moreover, even assuming that LP & L knew that there were overhead lines above the tank, that by itself does not mean LP & L had knowledge the lines were unreasonably dangerous. The electrical lines could only become unreasonably dangerous if other activity at the grease tank changed the situation. If that other activity were foreseeable or expected, the case may be different, but in this case that activity was the very unusual cleaning of the tank — the first time in 30 years, and LP & L cannot be charged with knowledge that the tank would be cleaned, particularly with a 33 foot pole, an unorthodox tool to say the least. Only Shell, plaintiffs, and their employer knew or should have known the tank would be cleaned by using such a scraper.
Even if there was some sort of knowledge about the electrical lines, their location, and that they were not insulated, plaintiffs did not prove that the wires were unreasonably dangerous. As a matter of fact, plaintiffs’ expert, Professor Nethken, an electrical engineer, testified that the overhead lines were in compliance with the National Electrical Safety Code. While this is not conclusive, Professor Nethken also testified that the distance between the tank and the lines exceeded the National Electrical Safety Code by about 300%. Thus, there was no dangerous condition for LP & L to observe.
Thus, plaintiff failed to prove either that the electrical lines were unreasonably dangerous or that LP & L knew or should have known that they were. Therefore, a directed verdict granted in favor of LP & L was proper.
AFFIRMED.