94 So.2d 532 (1957)
Lee D. HUGHES, Plaintiff-Appellee,
v.
LOUISIANA POWER AND LIGHT COMPANY, Defendant-Appellant.
No. 4165.
Court of Appeal of Louisiana, First Circuit.
March 20, 1956.
On Rehearing May 2, 1957.
*533 Monroe & Lemann, Andrew P. Carter, New Orleans, Reid & Reid, Hammond, for appellant.
Iddo Pittman, Jr., Hammond, for appellee.
TATE, Judge.
Defendant power company appeals from judgment awarding plaintiff Hughes $551.60 damages. Plaintiff-appellee answers the appeal requesting increase in the award.
At about 2:00 a. m., on April 16, 1954, lightning struck a transformer belonging to defendant company situated on or near Hughes' property and serving only Hughes' premises. At this time and for several hours thereafter it was raining heavily "and there was quite a bit of lightning flashes," Tr-35.
Mrs. Hughes at once called defendant company. Its servicemen located the cause of the trouble as the burnt transformer at about 4:00 a. m., radioed for a new transformer, and installed the new transformer at about 5:30 a. m. At this time the lights went on in the house and the barn, although the milking machine did not then operate.
About 30 minutes later, the company servicemen were radioed to return to Mrs. Hughes to assist her in replacing a burned fuse; they returned, replaced the fuse, saw that the milking machine commenced running, and left. Mrs. Hughes hosed down the floor of the barn for about three or four minutes, left the barn to fix breakfast, and about twenty minutes later saw the barn on fire.
The company's 2400 volt power line brought the electric current to the company's transformer, where the current was *534 transformed into 220 volt current for the barn machinery, and 110 volt current for the house and other lights. From this transformer some current went to the residence, some to the barn. The current to the barn passed through the main switch-box, in which there were two fuses. From one fuse, the current operated the barn lights. From the other, the current (passing through yet another fuse several feet distant solely for the milking machine) operated the milking-machine and perhaps other machinery.
As stated before, following installation of the new transformer, the Hughes' electrical service was restored except for that leading from the fuse in the barn switch-box which led to the milking-machine. On their second visit, defendant's servicemen pried loose with pliers this fuse, which was burned and charred, and inserted another fuse furnished by Mrs. Hughes, following which the milking-machine commenced operating. It was shortly after this that the fire was discovered.
Defendant vigorously assails the District Court's finding that: "When the new fuse was placed in the box by the employees of the defendant company, it completed the circuit which allowed the flow of electricity into all of the wires in the barn and unquestionably precipitated the fire." However, we believe this finding supported by the preponderance of the evidence, including the short time interval; the fact that no trouble in the wires manifested itself since their installation fifteen months prior to this incident; the testimony of defendant's employees that a surge of lightning through the fuse-box could have damaged the electrical wiring system on the other side thereof; the uncontradicted testimony that after the fire every wire leading out of the fuse box (but not those leading in) were burned and were burned along the wall near the fuse box (Tr-88, defendant's district manager), from the switch and up into the attic (Tr-82). We note that defendant's electrical engineering expert with praiseworthy frankness testified, Tr-97:
"Q. Is it possible that, and even probable, that the lightning surge that hit the transformer could have deteriorated the wiring in the barn, creating a dangerous condition?
"A. It is possible, and under _________
"Q. What about the probability?
"A. _________ under certain conditions, and in this instance particularly, it is a very good probability."

We may add that although defendant urges that perhaps the hosing of the floor or other causes may have intervened to cause the fire by wetting the wires, that the record is devoid of any evidence as to such other causes. For instance, the wires were situated on the wall and ceiling, and only the floor was hosed, and Mrs. Hughes testified that there was no possibility that water had gotten from the floor to the wall and ceiling.
In the absence of Louisiana jurisprudence directly in point, both parties cite to us the Annotation, "Liability of electric company to one other than employee, arising from its failure to shut off current," 32 A.L.R.2d 244, at page 249, Section 9, "Defects in customer's equipment". Defendant's brief concisely summarizes the rule of law applicable as follows:
"Generally, where an electric company furnishes current to wires or appliances maintained by a customer, and, because of a defect therein, the passing of current through the wires or appliances results in personal or property damage, the company is liable on the ground of neglect in not shutting off the current, or in continuing to furnish it, provided the company knows, or should know, of such defect. (See comment in 32 A.L.R.2d 282, Sec. 9, and the first cases cited thereunder). However, an electric company is not liable for damages arising from its failure to shut off current passing to a customer's wires or equipment, where the company is without *535 knowledge of any defect." (Italics those of briefwriter.)
Otherwise stated:
"The duty and responsibility of a mere generating company is generally held to be limited to making a proper connection and delivering the electric current to the purchaser's wires and appliances in a manner which, so far as such delivery is concerned, protects life and property, and there is no duty of inspection to see that the purchaser's wires and appliances are in a safe condition and kept so. Accordingly, where wiring or other electrical appliances on private premises are owned and controlled by the owner or occupant of such premises, a company which merely furnishes electricity is not responsible for the insulation or condition of such wiring or appliances and is not liable for injuries caused by their defective condition, to such owner or occupant, * * *. [However,] knowledge of the defective and dangerous condition of a customer's appliances will charge even a mere generator and supplier of electricity with liability for consequences, where current is thereafter supplied to such defective and dangerous appliances, in which case it is the energizing of the line with knowledge of the conditions, and not the conditions themselves, which forms the basis of liability", 29 C.J.S., Electricity, § 57, pp. 611-613. See also 18 Am.Jur.Verbo "Electricity", Sections 46-53, 62, 85, 100.
In an extremely able and eloquent brief, counsel for defendant urges that to uphold the judgment of the District Court herein in effect constitutes the defendant company the insurer of its customers, and assumes in it a duty, to inspect fully the wiring of its customers before resuming the flow of electricity into its customers' premises after an interruption of the service. We are reminded that the action of defendant's servicemen herein in helping this lady replace her burned fuse was an instance of defendant's humane and public-spirited attitude in the interest of good public relations in helping customers, particularly women and children, rather than requiring them to call their private electricians. Defendant urges that even had its servicemen inspected the wiring before resuming service, perhaps the perforations in the wires may have been so small as to escape notice, or so hard to find and so long to search for, that to impose this duty upon defendant power company would be unreasonable.
However, defendant overlooks that liability herein is imposed, if at all, not upon defendant's failure to inspect the customer's wiring, but upon its resuming electric service with actual or presumed knowledge that due to lightning damage plaintiff's wiring was or might be in a dangerous condition. It is unnecessary for us to determine how great defendant's duty was before it turned on the current, if charged with actual or presumptive knowledge of the potential danger to its customer's premises through this damaged wiringwhether, for instance, a simple warning rather than an inspection would discharge this duty. For in this instance, without contradiction, the record indicates that defendant's servicemen simply replaced the charred fuse, after having changed the burned transformer, without discussing and probably without thought of the potential hazard, in their haste to service other storm-caused troubles.
Thus, resolution of the legal issues herein simply requires our determination whether under the circumstances herein, defendant through its employees can be charged with knowledge of the hazardous condition of plaintiff's wiring potentially created through the lightning damage to its transformer and the surge of great electric current past the fuse into the wires.
Defendant urges that the District Court erred in finding: "They knew the transformer had been blown out by being struck with lightning." This finding is supported by the testimony of Mrs. Hughes that the servicemen so informed her, by the circumstances of the stormy night with many lightning flashes from which such servicemen could reasonably infer that such was the cause of the sudden interruption of electrical service, or held to knowledge *536 that such was the probable cause thereof. (And, in fact, the testimony of defendant's expert corroborates Mrs. Hughes' testimony, and Article 2 of defendant's answer admits that lightning struck the transformer.)
This knowledge, especially with their finding the charred fuse leading to the milking-machine, and their admitted familiarity as electrical men that lightning could cause such damage to the wiring, in our opinion and in the District Court's holding charges defendant through its employees with knowledge "that when lightning caused the transformer and fuses to blow it could have caused other damage as well"; and consequent to such actual or presumptive knowledge of the potentially hazardous damage to plaintiff's wiring, defendant's agents were under a duty not to simply turn on the current and go on their way without warning, waiting, inspection, or any precaution or notice whatsoever for or to their customer of what turned out to be an actuallyrather than merely potentially hazardous condition of the wiring.
Because of this specialized knowledge, we do not find persuasive defendant's argument that upon replacing the charred fuse and seeing the milking machine commence operating, defendant could not reasonably anticipate the defective condition of the wiring.
Plaintiff answered the appeal requesting an increase in the award for loss of $112 milk production in his cows for about two weeks. The only proof of this loss was plaintiff's testimony that milk production fell after the fire, and as held by the court below correctly rejecting this item of damages, there is no testimony of the causal relationship of the fire to the alleged lesser milk production.
Defendant urges that plaintiff's damages were not proven since principally by the testimony of a contractor's employee that he had made an estimate of the cost of repairing the damages to the barn caused by the fire, which was in the sum of $487.60. Defendant did not object to this estimate, nor cross-examine this witness as to his qualifications or as to the correctness of the estimate. Despite defendant's contrary assertion, estimates can properly prove damages recoverable, even though the repairs have not been made, Woodward-Wight & Co. v. Douglas Public Serv. Corp., La.App. 1 Cir., 75 So.2d 896, Parr v. Rogers, La.App., 71 So.2d 659, Christian v. Martin, La.App., 38 So.2d 181, Thomas v. Stewart, La.App. 1 Cir., 29 So.2d 604, Folse v. Flynn, La.App., 200 So. 160, Bianchi v. Mussachi, 1 La.App. 291. The first two cited cases illustrate instances where such estimates were the basis of the award of damages even though the repairs were either not made because the car was traded in on another, or were only partially performed by the owner's own labor and partially incompleted at time of trial.
The special damages for cost of wiring and loss of wages in the amount of $19 were proven (Tr-23), but the estimated cost of repairing the water heater ($45, Tr-22) must be disallowed because plaintiff himself admitted that the damage to the water heater wiring may have been caused by the prior surge of lightning through the wires (Tr-30), rather than through defendant's negligence herein. This latter item of damages was inadvertently allowed by the District Court, and the judgment must be amended to exclude same.
For the above and foregoing reasons, the judgment of the District Court herein is amended to reduce the amount of the award to Five Hundred Six and 60/100 (506.60) Dollars, together with legal interest from date of judicial demand until paid; and as amended, the judgment is affirmed in all other respects.
Amended and affirmed.

On Rehearing
PER CURIAM.
A rehearing was granted because of appellant's forceful argument that a power *537 company could only be held liable under facts similar to those herein when charged with actual knowledge of the defective condition of the customer's wiring which made the company's resumption of service dangerous.
We have carefully reviewed this record and the applicable law and we believe our original holding is correct under the District Court's and our own appreciation of the facts herein, stated in our original opinion.
We think able counsel for defendant misapprehends the effect of our decision when he argues that we held the defendant electric company liable for the subsequent fire on plaintiff's premises just because the defendant company resumed electric service after lightning had struck the transformer. It was not our intention to hold that liability attaches merely because of such circumstance, nor that the electric company was liable simply because its employees had changed the burned fuse and inserted a new fuse as an accommodation to its customer (following which the current surging through the new fuse into the defective wiring caused the fire which destroyed the premises in question.)
Had the replaced fuse been simply burned out, such as might have been compatible with a normal cause such as an overload on the line, then we do not think that the electric company's employees were under any duty to anticipate equipment or wiring so defective, that their resumption of electrical service by replacing the fuse might cause damage to plaintiff's property. But under all the circumstances of this case, the fuse replaced by defendant's employees was burned and charred to such an extent that defendant's employees (with their specialized knowledge) were put on notice of the good probability that the wiring had been damaged beyond the fuse by a surge of lightning, and that because of this it was dangerous to resume electrical service; and therefore, as a consequence of this presumed knowledge, the replacing of the fuse permitting the resumption of electrical service to plaintiff's milking machine circuit without taking some safeguarding precaution or warning plaintiff so as to enable him to take same, constituted actionable negligence imputed to their employer, the defendant herein; as a result of which the District Court properly cast defendant for damages sustained through these negligent acts and omissions:
If the power company knows or should know of defects in a private wiring system or appliances which will cause damage, it is negligence on the power company's part to energize the system, although ordinarily in the absence of such actual or constructive knowledge the power company's duty terminates at its meter. (See authorities cited in our original opinion.)
For the above and foregoing reasons, our original opinion and decree herein are reinstated, affirming the judgment below.
Affirmed on rehearing.