LANIER, Judge.
This action is a suit for damages in tort arising from a residential fire. Suit was filed by Northern Assurance Company (Northern), as the subrogee of its insured, Cecil Coates, the owner of the residence, against Louisiana Power & Light Company (LP & L), the supplier of electricity to the Coates residence. Coates intervened seeking recovery of damages in excess of the insurance proceeds paid to him by Northern. The trial court found as fact that LP & L was negligent because it used an improper method to terminate electrical service to the Coates residence. The trial court awarded Northern $62,341.00 and Coates $20,300.75. LP & L took this sus-pensive appeal.
FACTS
On May 10, 1982, two fires occurred at the Coates residence on Macedonia Road in Ponchatoula, Louisiana. The first occurred at approximately 11:00 a.m. This fire was reported by Diane Hampton, Mrs. Coates’ sister, after she smelled and then observed smoke emanating from the rear of the Coates residence.[1] Shortly after the fire was reported, the local fire department arrived and extinguished the blaze. The fire damage was limited to the master bathroom and den stairs. Mr. and Mrs. Coates were not home at the time of the first fire, the cause of which is unknown.
This first fire was also reported to LP & L. LP & L has a policy of dispatching utility men to the scene of all residential fires to terminate electrical service to the residence to insure the safety of the firemen fighting the blaze and to prevent further damage to the residence. The four methods of terminating electrical service to a residence are removing the meter, cutting the transformer fuse, cutting the wires at the pole, and cutting the wires at the weatherhead (also known as the service mast). The method of terminating electrical service is left to the discretion of the utility men at the fire scene.
Owen Joiner and Sidney Gleber, employed by LP & L as utility men, were dispatched to the Coates residence. They arrived at the fire scene at approximately *772 11:30 a.m. and disconnected electrical service to the home by removing the meter.
The meter removed from the Coates residence was owned by LP & L and supplied to the Coates. The meter pan, mast, weatherhead and copper wires, located on the outside wall of the Coates residence and collectively called the service entrance, were owned and installed by the Coates. Attached hereto as Appendix A is a plan for a typical overhead service installation taken from Exhibit D-6. The breaker box was located inside the house and was owned by the Coates. The copper wires (also called conductors) located in the Coates service entrance extended approximately three feet out of the weatherhead. LP & L spliced aluminum wires owned by it to the end of the copper wires supplied by the Coates. The aluminum wires supplied by LP & L were connected to a transformer owned by LP & L which is located on LP & L’s pole on the main power line.
Following the first fire, a substantial group of friends and relatives of the Coates family began to convene in and around the home of Mrs. Coates’ mother to give consolation and moral support. At approximately 4:00 p.m., while these people were milling in and about the property, a second fire occurred at the Coates residence which totally destroyed the dwelling and its contents.
At the time of these fires, the Coates residence was insured by Northern under a homeowner’s policy which provided limits of $50,000 for the dwelling and $25,000 for the contents. As a result of these fires, Northern paid its $50,000 limit on the dwelling and $12,341 of its $25,000 limit for damages to the contents, for a total payment of $62,341.
ADMISSIBILITY OF EVIDENCE OF OTHER FIRES
(Assignment of error number 3)
LP & L contends the trial court committed error by refusing to permit it to introduce evidence of prior and subsequent fires involving the Coates. This evidence was offered to show “that it was possible that third persons over which LP & L had no control may have had a hand in this fire.” LP & L proffered this evidence.
In Lee v. K-Mart Corporation, 483 So.2d 609, 612-613 (La.App. 1st Cir.1985), writ denied, 484 So.2d 661 (La.1986), this court stated the following:
Evidence of prior accidents or the lack thereof is admissible to show whether a thing or place which caused injury was dangerous and/or whether the defendant had knowledge of the dangerous condition .... At issue in the instant case is whether evidence of subsequent accidents or dissimilar accidents is admissible for a relevant purpose. The weight of authority in the United States appears to be that evidence of other similar accidents (prior and subsequent) is admissible to (1) show the existence of a dangerous physical condition, situation or defect, ... (2) show a continuing defect or condition, or a continuing course of negligent action or conduct caused injury, (3) show the cause of the accident or injury and (4) rebut a claim of impossibility, ... Prior other accidents are relevant to show knowledge or failure to take precautionary measures; subsequent other accidents are not relevant to show knowledge or failure to take precautionary measures; subsequent other accidents are not relevant for these purposes. However, evidence of other accidents is only relevant where such accidents are closely related in circumstances to the accident, injury or hazard in the instant case.... Thus, to be relevant the other accident should occur at substantially the same place and under substantially the same conditions and must be caused by the same or a similar defect, danger, act or omission. Evidence of other accidents occurring at substantially different places or under different circumstances or conditions is irrelevant and inadmissible. (Emphasis added)
These same principles are applicable to other intentional acts.
The evidence proffered by LP & L failed to establish that any of the prior or subse *773 quent fires involved substantially the same circumstances and conditions which caused the fire in the present case. Three of the other fires offered by LP & L involved automobiles owned by the Coates, not a residence. Two of the other fires were house fires, but electrical failure at the weatherhead was not the cause of these fires. Two of the fires involved a house-trailer, and these fires were not caused by electrical failure. Failure to establish that any of the prior or subsequent fires involved substantially the same conditions as those which caused the fire in this ease renders the evidence irrelevant and inadmissible. The trial court did not err in refusing to admit the evidence.
This assignment of error is without merit.
ADMISSIBILITY OF EVIDENCE OF REMEDIAL ACTS
(Assignment of error number 2)
LP & L contends that the trial court committed error by admitting into evidence testimony and photographs showing the method used by LP & L to terminate electrical service at subsequent fires. Specifically, evidence was admitted which showed LP & L terminated electrical service at five subsequent fires by cutting electrical service at the pole instead of removing the meter.
It is well settled that evidence of remedial measures taken subsequent to an accident, for the purpose of preventing a similar recurrence, is not admissible to show negligence or show an admission of fault. Burk v. Illinois Central Gulf Railroad Company, 529 So.2d 515 (La.App. 1st Cir.), writ denied, 532 So.2d 179 (La.1988); Brooks v. St. Tammany Parish School Board, 510 So.2d 51 (La.App. 1st Cir.), writ denied, 513 So.2d 821 (La.1987). Cf La.C.E. art. 407, effective January 1, 1989 (but not applicable hereto).
The record shows that the trial court relied on the evidence of subsequent remedial acts at other fires to determine that LP & L was at fault. The trial court in its written reasons for judgment stated the following:
The judgment call made by defendant’s employees to remove the meter did not, under these circumstances, accomplish its purpose of removing a condition dangerous to property. The testimony established that the cutting of the line at the pole or the removal of the transformer fuse would have prevented the escape of the electrical energy from the weath-erhead. It was shown that in other cases within this jurisdiction, under similar cicumstances, the defendant had exercised more extreme care. The care exercised here was insufficient. (Emphasis added)
The trial court committed error by admitting and considering the evidence of subsequent remedial acts at other fires to show fault.
This assignment of error has merit.
APPLICABLE STANDARD FOR APPELLATE REVIEW OF FACTS
Ordinarily, the trial court’s findings of fact are reviewed under the manifest error (clearly wrong) standard. Arceneaux v. Dominque, 365 So.2d 1330 (La.1978). However, where some legal error, such as improper admission of evidence, interdicts the trial court’s fact-finding process, the manifest error (clearly wrong) standard is no longer applicable, and the appellate court must make its own independent review of the record and determine a preponderance of the evidence. McLean v. Hunter, 495 So.2d 1298 (La.1986) and the cases cited therein. The improper admission and consideration of evidence of subsequent remedial acts at other fires by the trial court has interdicted its factual findings herein. Accordingly, we have made our own independent review of the record to determine a preponderance of the evidence.
LIABILITY OF LP & L
(Assignments of error numbers 1 and 4)
LP & L contends the trial court committed error by using an erroneous legal stan *774 dard to determine liability and by finding it was negligent.
In Levi v. Southwest Louisiana Electric Membership Cooperative, 542 So.2d 1081, 1083-1084 (La.1989) appears the following:
The crucial questions are (a) whether the power company was required to recognize that its conduct involved a risk of causing physical injury or loss to another in the manner of that sustained by the plaintiff, and, if so (b) whether the possibility of such injury or loss constituted an unreasonable risk of harm. These issues are decisive under either a duty-risk or a traditional negligence approach .... The legal duty under one approach and the standard of conduct under the other impose the same obligation, viz., when the power company realizes or should realize that the transmission of electricity through its line presents an unreasonable risk of causing physical harm to another, it is under a duty to exercise reasonable care to prevent the risk from taking effect.
An electric utility is not required to guard against situations which cannot reasonably be expected or contemplated. Hebert v. Gulf States Utilities Company, 426 So.2d 111 (La.1983). Specifically, an electric utility has a duty not to supply power across a private transmission line which it knew or should have known was unreasonably dangerous. Sibley v. Gifford Hill and Company, Inc., 475 So.2d 315 (La.1985).
The record reveals the following facts. A fire occurred at approximately 11:00 a.m. on May 10, 1982 at the Coates residence. This fire was extinguished shortly after it began by the local fire department. Flame damage was found in the master bathroom and in the stairs located in the den. The wall separating the master bathroom and den stairs was burned out. The remaining rooms on the first floor received only water and smoke damage. There was no damage to the second floor. The cause of the first fire was not determined.
At approximately 11:30 a.m. on May 10, 1982, Joiner and Gleber from LP & L arrived at the fire scene. The fire had already been extinguished by the time they arrived. After inspecting the electrical wires and apparatuses for damage, they proceeded to terminate electrical service to the Coates residence by removing the meter.
At approximately 4:00 p.m., a second fire totally destroyed the Coates residence. It was determined that a short occurred at the weatherhead of the Coates service entrance. This shorting occurred at the portion of the line owned by the Coates; the shorting did not occur in the part of the line owned by LP & L. This failure was believed to be the cause of the second fire.[2] Terminating electrical service at the pole would have made the shorting impossible.
Joiner, Gleber and Roscoe Holcomb, all LP & L employees, testified that LP & L dispatches servicemen to a fire scene to terminate power to the site for the purpose of protecting the firemen from injury and preventing further damage to the premises. They stated that the four methods of terminating electrical service to a premises are removing the meter, cutting the transformer fuse, cutting the wires at the weatherhead, and cutting the wires at the pole. They testified that the decision as to which method of termination is to be used is left to the discretion of the employee at the fire scene. They testified that the meter is generally pulled unless there was apparent damage to the electrical entrance of the building.
Joiner testified that after arriving on the fire scene, he entered the residence through the rear door, went to the second *775 floor to check for fire damage, and then returned to the first floor to check for fire damage. He examined the breaker box located inside the residence and found no fire damage to it or in the area immediately surrounding it. He inspected the wires, weatherhead, mast, and meter pan located on the outside of the residence and found no apparent damage to any of them. He stated that he felt the meter and meter pan after the first fire and neither were hot. He testified that he found no fire damage to the meter or meter pan, and found no damage in the area of the service entrance.
Gleber testified that he removed the meter from the Coates service entrance. He saw no apparent damage to the meter, meter pan, weatherhead, mast or wires. He stated that neither the meter nor the meter pan were hot when he removed the meter. He saw no fire damage to the exterior of the house near the service entrance.
Cecil Coates testified that he went into the residence after the first fire and examined the fire damage in the master bathroom. There was fire damage to the entire wall in which the breaker box was located. The top of the wall containing the breaker box was burned away but the bottom of this wall was not. There was no fire damage on the exterior of the residence near the service entrance.
Ronnie Adams testified that there was fire damage to the wall in the master bathroom which contained the breaker box. He stated that he did not remember seeing any fire damage to the exterior of the residence near the service entrance.
The testimony shows that LP & L’s employees were reasonable in their decision to remove the meter to terminate the electrical service. The evidence shows that a reasonable inspection was conducted by Joiner and Gleber of all wires and other instrumentalities supplying electricity to the Coates residence, and no apparent hazards were found. There was no apparent fire damage to the meter, meter pan, mast, weatherhead or wires all located on the exterior of the residence. There was conflicting testimony about the fire damage in the area of the breaker box. However, when the meter was removed, no electricity flowed to the breaker box. Even assuming that there was fire damage in this area, this alone would not reasonably lead LP & L to anticipate that there was a short in the weatherhead. The preponderance of the evidence shows that LP & L did not breach its duty and was not negligent. The trial court ruling to the contrary is wrong.
This assignment of error has merit.
DECREE
For the foregoing reasons, the judgment of the trial court is reversed, and plaintiffs and intervenor’s petitions are dismissed with prejudice. The plaintiff and inter-venor are cast for all costs of these proceedings.
REVERSED AND RENDERED.
EDWARDS and SHORTESS, JJ., dissent and assign reasons.
*776 [[Image here]]

. The Coates residence is surrounded on all sides by the homes of Mrs. Coates' relatives, namely: Viola Adams, her mother; Lorena Miller, her sister; Diane Hampton, her sister; Norma Lee Toney, her sister; and Ronnie Adams, her brother.

. At trial, there were two theories advanced by the parties for the cause of the second fire. The plaintiff’s theory (which was accepted by the trial court) was that the first fire caused the wires in the weatherhead to breakdown which eventually led to the short and the second fire. The defendant’s theory was that there was a rekindling of fire after the first fire and that the heat from this second fire caused the wires in the weatherhead to breakdown and eventually short. Since we find that LP & L did not breach its duty of care to the plaintiff and intervenor, it is not necessary for us to decide the actual cause of the second fire.