580 So.2d 351 (1991)
NORTHERN ASSURANCE COMPANY
v.
LOUISIANA POWER & LIGHT COMPANY.
No. 90-C-0941.
Supreme Court of Louisiana.
May 6, 1991.
Rehearing Denied June 13, 1991.
*352 Gordon W. Matheny, Hammond, for Cecil Coates plaintiff-applicant.
Steven H. Beadles, Knox, Beadles & Johnston, Shreveport, for Northern Assur. Co. of America plaintiff-applicant.
J. Wayne Anderson and Gerard A. Bos, Monroe & Lemann, New Orleans, for Louisiana Power & Light Co. defendant-respondent.
LEMMON, Justice.
This is an action by plaintiff homeowner and his subrogated fire insurer against an electric utility company to recover damages for the loss of plaintiff's home. Plaintiff's theory of recovery is that the utility company, having been called to plaintiff's home because of a relatively small fire earlier on the day of the casualty and having inspected the premises, failed to take appropriate measures under the circumstances to safeguard the premises. The critical issue is whether plaintiff proved that the utility company knew or should have known of a potential defect in the electrical wiring after the first fire and therefore had the duty as the provider of electricity to withhold electrical service from the area of the premises containing the potential defect until the wiring was checked and corrected, if necessary.
Facts
Plaintiff and his family were living in a two-story home which he had constructed on a vacant lot. He had completed most of the construction work, including the electrical wiring, except for some interior work on the upstairs walls and ceiling.
When Louisiana Power and Light Co. (LP & L) contracted to provide electrical service to the home, its employees inspected the electrical service entrance installation, which had been furnished and installed by plaintiff, before providing the meter to measure the amount of electricity used by plaintiff. The following annotated diagram from the record shows a typical service entrance installation which is helpful in understanding the equipment and terminology contained in the record and referred to in this opinion:
*353 
LP & L provided electrical service by a service drop line from the transformer on the pole to the point of connection with the electrical service installation provided by plaintiff. The point of connection was the point where LP & L's aluminum wires were connected to plaintiff's copper wires that extended about three feet out from the weatherhead.
Although LP & L had no responsibility generally to inspect the wiring on the customer's side of the point of connection before beginning service, LP & L was responsible prior to installing the meter to insure that the service entrance installation was the proper height and was correctly grounded.
When a fire caused electrical damage in a building within LP & L's service district, the fire department notified LP & L so that it could immediately disconnect service in order to protect the firemen fighting the fire. After extinguishment of the fire, LP & L was responsible to determine the steps necessary to safeguard against hazards created by the fire (such as burning of insulation on the wires) and to prevent further fires or other damage to persons or property. If damage was extensive enough so that electrical service could not be continued or restored safely, LP & L disconnected the service, according to the nature of the fire, in one of three ways: (1) by removing the meter, (2) by removing the transformer fuse, or (3) by cutting the wires at the pole or between the pole and the point of connection.
On the day of the casualty a small fire of unknown origin occurred at plaintiff's home and caused damage which was limited to the area of the master bathroom, the den stairs, and the wall between the bathroom and the stairs. The following diagram shows the location of the master bathroom, the den stairs, the electrical service entrance installation (M), and the circuit breaker panel (B):
*354 
The fire department quickly brought the blaze under control. Two LP & L servicemen arrived at the scene after the fire was extinguished. They inspected the interior and exterior of the premises in order to insure the safety of persons on the premises and to determine the necessary steps to prevent any further damage. The servicemen determined that removing the electrical meter on the exterior wall of the residence (thereby cutting off service on the house side of the meter) would adequately safeguard the premises and its occupants.
About four hours after the first fire, a second fire occurred which completely destroyed the dwelling and its contents. Subsequent investigation revealed that the second fire was caused by a short circuit in the weatherhead, the cap at the top of the service mast which extended about five feet above the meter on the exterior of the house. Because the weatherhead was located between the meter (which had been removed after the first fire) and LP & L's service drop line from its pole, there was still voltage at the weatherhead after removal of the meter had terminated service on the house side of the meter. The second fire occurred when an energized wire inside the metal weatherhead came in contact with the metal and caused arcing which created heat sufficient to ignite the wood on the side of the building. Witnesses to the eruption of the second fire saw sparking from the weatherhead (indicating short circuiting) just before the flames started. When the weatherhead was inspected after the fire, there was a hole burned through the top of the steel weatherhead.
Plaintiff's subrogated fire insurer, who had paid a portion of the loss, filed this action against LP & L, contending that the second fire resulted from a defect in the weatherhead which was caused by the first fire and which LP & L should have discovered during its investigation after the first fire. The insurer further asserted that LP & L should not have merely disconnected service at the meter and allowed voltage to continue to the weatherhead, but rather should have discontinued service altogether by cutting the line at the pole. Plaintiff intervened to recover his damages which exceeded the payment made by the insurer.
LP & L defended on the basis that it had acted properly after the first fire in terminating service by removing the meter and that the short circuit in the weatherhead (owned by plaintiff) was not caused by the first fire and was not foreseeable.
The evidence at the trial focused on the proper method for terminating electrical service to the residence after the first fire. LP & L's district manager testified that the determination of whether and where to disconnect *355 service during or after a fire depends on the nature of the fire. If a fire is very restricted to a particular area, as when an appliance catches fire, it might be necessary only to turn off the circuit breaker to the appliance. According to the manager, removal of the meter was the usual method of disconnecting service when the fire was inside the building and there was no damage to the area around the service entrance installation or the circuit breaker panel. If there was physical damage to the service area or to the wires inside or coming into the meter pan, then the wires should be cut at the pole. The manager conceded that when energized wires are subjected to substantial heat, there can be damage to the insulation on the wires which may lead to a short circuit. However, the manager stated that the insulation on the wires in the weatherhead, if safe when installed, would not have broken down without the application of some external force.
The manager examined the service mast and the wires that were removed from plaintiff's house. He noted that extreme heat had been applied to the wires at the top of the mast which melted the insulation, but the insulation on the wires at the bottom of the mast (where the wires were connected to the meter pan) was in normal condition.
The servicemen who disconnected the service after the first fire testified that there was no damage in the area of the circuit breaker panel in the master bathroom or the area of the meter and the service installation on the exterior of the house. They also examined the inside of the meter pan (which was not hot) and the breaker panel, and found no damage to the installation or the wires. They simply removed the meter because the home appeared to be livable and service could be restored easier and on short notice when plaintiff was ready to move back into the house.
Plaintiff testified that after the first fire there was no damage to the outside wall in the vicinity of the service installation, except for some burning above the window near the weatherhead. The principal interior damage was to the wall between the bath and the den, which was "burned out", and to the rear wall of the bathroom (containing the breaker panel), the top part of which was "burned completely away".
Plaintiff's brother-in-law inspected the house after the first fire and did not see any fire damage around the electrical service installation. However, he did see fire damage above the top of the bathroom window and later saw the second fire break out in the weatherhead, near where the first fire "had burned out that bathroom window".[1]
The district court rendered judgment in favor of plaintiff, finding that the second fire started from the escape of electrical energy at the weatherhead.[2] The judge noted that the second fire would have been prevented if LP & L had cut the line at the pole. Observing that the evidence showed LP & L had cut service at the pole under similar circumstances in other cases, the court concluded that LP & L's termination of electricity at the meter after the first fire did not fulfill its duty to protect the premises against foreseeably dangerous conditions.
The court of appeal reversed the judgment of the district court in a three-to-two decision. 561 So.2d 770. The majority held that plaintiff's evidence which showed LP & L's termination of electrical service at five subsequent fires by cutting electricity at the pole, rather than removing the meter, constituted evidence of subsequent remedial measures and should not have been admitted.[3] Because the trial judge relied *356 on this inadmissible evidence, the court of appeal declined to afford any deference to his decision and conducted a de novo review of the record. The court concluded that LP & L's servicemen conducted a reasonable inspection of the wires and other instrumentalities supplying electricity to the residence and found no apparent hazards. Since there was no apparent damage from the first fire to the meter, meter pan, service mast, weatherhead or wires located on the exterior of the structure, the court concluded there was no apparent condition which should have led the servicemen to believe there was a potential short circuit in the weatherhead that might cause a second fire.[4]
We granted certiorari to review the intermediate court's decision, particularly as to the ruling on evidence of subsequent remedial measures. 565 So.2d 422 (La.1990).
Evidence of Subsequent Remedial Measures
The contested evidence consisted of photographs depicting five house fires, all of which were subsequent to and unrelated to plaintiff's fire. In each of these fires LP & L had disconnected power after the fire at the pole rather than at the meter.
Plaintiff's counsel offered the photographs during his cross-examination of LP & L's district manager about the different means used by LP & L to disconnect electricity after a fire. Defendant objected to the photographs on the basis that they were irrelevant. In support of the offer, plaintiff argued that the photographs impeached the witness by showing that LP & L had a consistent policy of cutting electricity at the pole after a residential fire.[5]
Fed.R.Evid. 407, pertaining to evidence of subsequent remedial measures, provides as follows:
When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.
The Advisory Committee's Note following Rule 407 states that the rule excludes subsequent remedial measures as proof of an admission of fault, the purpose of the exclusion of arguably relevant evidence being a policy against discouraging people from taking safety measures.[6] See McCormick on Evidence § 275 (E. Cleary 3d ed. 1984); 2 Wigmore on Evidence § 283 (J. Chadbourn rev. 1979).
In Givens v. DeSoto Building Co., 156 La. 377, 100 So. 534 (1924), this court set forth Louisiana's policy concerning the admissibility of evidence of subsequent remedial measures. The court refused to remand the case to allow the plaintiff to show that defendant, after the trial of the case, had placed a light on the step in the theatre where plaintiff had fallen. The court stated:
Whilst some courts hold to the contrary... the great weight of authority is that evidence of changes or repairs made subsequently to the injury, or as to precautions taken subsequently to prevent recurrence of injury, is not admissible as showing negligence or as amounting to an admission of negligence. The reason for the rule is that the effect of declaring such evidence competent would be to inform a defendant that, if he makes *357 changes or repairs, he does it under a penalty; for, if the evidence is competent, it operates as a confession that he was guilty of prior wrong. True policy and sound reason require that men should be encouraged to improve, or repair, and not be deterred from it by the fear that if they do so their acts will be construed into an admission that they had been wrongdoers. A rule, which so operates as to deter men from profiting by experience and availing themselves of new information, has nothing to commend it, for it is neither expedient nor just....
100 So. at 535.
More recently, this court in Toups v. Sears, Roebuck and Co., 507 So.2d 809 (La.1987) restated the rule that "[i]n general, remedial measures taken after an incident of negligent conduct are not admissible in evidence because such evidence would discourage people from taking steps to prevent future harm", but noted that in product liability cases this evidence is admissible insofar as it is "relevant in establishing what the manufacturer knew or should have known at the time of the injury". Id. at 816-17.
The prohibition against evidence of subsequent remedial measures is designed to bring within the scope of the rule any change, repair or precaution subsequent to an accident. See 2 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 407[01] (1990), citing Rozier v. Ford Motor Co., 573 F.2d 1332 (5th Cir.1978), a wrongful death action based on the negligent design of fuel tank which held that a document relating to alternative locations for tanks prepared prior to date of accident did not fall within the prohibition. The prohibition covers only measures taken after an event, such as post-accident repairs, installation of safety devices, changes in design, the removal of dangerous conditions, changes in procedure, the dismissal of an employee charged with causing an accident, changes in regulations, and changes in labels or instructions. 2 D. Louisell & C. Mueller, Federal Evidence § 164 (1985); McCormick on Evidence § 275, note 10 (E. Cleary 3d ed. 1984).
In the present case the disputed evidence was not evidence of remedial measures which were implemented after the event in litigation. LP & L's employees testified that the alternative procedure of cutting the line at the pole to shut off electricity after a house fire was in effect at the time of plaintiff's fire. Evidence of use of this procedure after plaintiff's fire did not show a change in policy designed to remedy any previous deficiencies in safety procedure. Therefore, the policy behind disallowing such evidence is not applicable here.
LP & L argues in this court, however, that the evidence was properly excluded because it had no impeachment value.[7] LP & L points out that evidence of its cutting wires at the pole after a fire on five subsequent occasions did not impeach the manager's testimony that at the time of the casualty the company used several methods (including cutting the line at the pole) to disconnect service after a fire.
The evidence had some probative value to support plaintiff's assertion that LP & L had a general policy to disconnect the electricity in cases of significant flame damage to the interior of the premises by cutting the wires at the poles, rather than by merely removing the meter. Moreover, in several of the subsequent fires, the line was cut at the pole although there was no damage to the service installation.[8] The evidence was therefore admissible for its probative value, particularly since that value *358 was not significantly outweighed by any prejudicial effect of the evidence.

Standard of Review
Because the disputed evidence did not involve subsequent remedial measures which significantly prejudiced LP & L, the court of appeal incorrectly conducted a de novo review of the record. Cf. Gonzales v. Xerox Corp., 320 So.2d 163 (La.1975). A review of the judgment of the district court must now be conducted, either by this court or by the intermediate court on remand (which we choose not to order), under the manifest error or clearly wrong standard. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Canter v. Koehring Co., 283 So.2d 716 (La.1973).

Standard of Care
Review in this case is complicated by the fact that the trial judge apparently applied an incorrect standard of care in determining LP & L's negligence. The trial judge noted that LP & L "owned and controlled the electrical energy it manufactured prior to its passage through the required metering device" and applied the following standard of care from Wooten v. Louisiana Power & Light Co., 477 So.2d 1142 (La.App. 1st Cir.1985):
It is well settled that Louisiana Courts require a high duty of care by those dealing in the manufacture and distribution of electricity. Electric transmission companies which maintain and employ high power lines are required to exercise the utmost care to reduce hazards to life as far as practicable, and are required to protect against reasonably forseeable situations. Mere compliance with safety standards does not, per se, relieve the utility of negligence. (emphasis by trial court).
Based on this standard of care, the district court determined that LP & L was negligent in cutting electricity off at the meter because this did not accomplish their purpose of removing a dangerous condition on the property.
The standard of care applied by the trial judge may have been appropriate in the Wooten case where the utility company owned the defective lines and equipment which caused the damage. Cf. Hebert v. Gulf States Utilities Co., 426 So.2d 111 (La.1983). However, when the utility company (as in the present case) is not the owner of the electrical facility which causes damage, but merely passes its electricity through this facility, a lesser standard applies. Sibley v. Gifford Hill and Co., 475 So.2d 315 (La.1985); Hughes v. Louisiana Power & Light Co., 94 So.2d 532 (La.App. 1st Cir.1957).
In Hughes, lightning struck LP & L's transformer which served only the plaintiff's property. Approximately three to four hours later, LP & L installed a new transformer, restoring electricity to the house and barn. LP & L also replaced a fuse in the barn switchbox which was burned and charred because of the surge. Once the fuse was replaced, the milking machine began operating. Shortly after the servicemen left the scene, the barn caught on fire. Then Judge Tate, writing for the court of appeal, set forth the following standard to be applied in determining the duty owed by LP & L:
Generally, where an electric company furnishes current to wires or appliances maintained by a customer, and, because of a defect therein, the passing of current through the wires or appliances results in personal or property damage, the company is liable on the ground of neglect in not shutting off the current, or in continuing to furnish it, provided the company knows, or should know, of such defect.... However, an electric company is not liable for damages arising from its failure to shut off current passing to a customer's wires or equipment, where the company is without knowledge of any defect.

The duty and responsibility of a mere generating company is generally held to be limited to making a proper connection and delivering the electric current to the purchaser's wires and appliances in a manner which, so far as such delivery is concerned, protects life and property, and there is no duty of inspection to see that the purchaser's wires and appliances are in a safe condition and kept so. Accordingly, *359 where wiring or other electrical appliances on private premises are owned and controlled by the owner or occupant of such premises, a company which merely furnishes electricity is not responsible for the insulation or condition of such wiring or appliances and is not liable for injuries caused by their defective condition, to such owner or occupant. However, knowledge of the defective and dangerous condition of a customer's appliances will charge even a mere generator and supplier of electricity with liability for consequences, where current is thereafter supplied to such defective and dangerous appliances, in which case it is the energizing of the line with knowledge of the conditions, and not the conditions themselves, which forms the basis of liability.
94 So.2d at 534-35 (emphasis in original).
Pursuant to this standard, the court in Hughes determined that LP & L was negligent based on the following facts:
Had the replaced fuse been simply burned out, such as might have been compatible with a normal cause such as an overload on the line, then we do not think that the electric company's employees were under any duty to anticipate equipment or wiring so defective, that their resumption of electrical service by replacing the fuse might cause damage to plaintiff's property. But under all the circumstances of this case, the fuse replaced by defendant's employees was burned and charred to such an extent that defendant's employees (with their specialized knowledge) were put on notice of the good probability that the wiring had been damaged beyond the fuse by a surge of lightning, and that because of this it was dangerous to resume electrical service....
94 So.2d at 537. (emphasis added). In determining that LP & L, although the mere supplier of electricity, should have known of the defect in the wiring owned by the plaintiff and that the resulting fire was reasonably foreseeable, the court focused on the extent of damage to the fuse replaced by the servicemen.
The standard of care set forth in Hughes was recently applied by this Court in Sibley v. Gifford Hill & Co., 475 So.2d 315 (La. 1985). In Sibley, plaintiff's employer constructed, owned, controlled and maintained a transmission line on its property through which LP & L provided electrical service to the employer's plant. This court recognized that in such a situation "LP & L, as a public utility company engaged in the distribution of electricity, had a duty not to supply power across a private transmission line which it knew or should have known was unreasonably dangerous". 475 So.2d at 319. Under the facts of the case, this court found that LP & L had not breached its duty.
Accordingly, there is a different standard of care for an electric company when it furnishes current to defective wires or equipment owned and maintained by the customer than when it transmits current across defective wires or equipment owned and maintained by the company. In the former case the electric company is only liable if it knew or should have known of the defect.
In the present case plaintiff owned the defective portion of the electrical service assembly, specifically the weatherhead and wires which the trial judge determined to be the cause of the second fire. The appropriate standard of care applicable to LP & L was to refrain from furnishing electricity to the defective area if it knew or should have known of the defect.

Liability of LP & L
In reviewing the judgment of the district court, this court must give deference to the district court's findings of fact which are not clearly erroneous, but must apply to these facts the correct standard of care in order to determine LP & L's liability. LP & L was liable for the second fire only if it knew or should have known that a defect resulting from the first fire created a dangerous condition at some point between the meter and the pole. Stated otherwise, LP & L's failure to cut the wires at the pole after the first fire was not a legal cause of the second fire unless LP & L's failure breached some duty owed by LP & L. There was no duty to cut the wires at *360 the pole unless LP & L knew or should have known that there was a dangerous condition in the wires between the meter and the pole.
The first fire occurred in the master bathroom. While there was no apparent damage from the first fire to the breaker panel (shown by a "B" in the sketch on page 3) on the rear wall of of the bathroom, there was flame damage to the rear wall, the top of which (according to plaintiff) was completely "burned away". And while there was no apparent damage from the first fire to the service installation located on the outside of the rear wall, there was fire damage above the window (shown on the sketch on page 3) near the weatherhead.
Plaintiff's expert in electrical engineering testified that the heat from the first fire caused the insulation on the wiring at the top of the mast to soften (which can occur in the low two-hundred degree range), and the insulation on the wires in the weatherhead (where the wires were already under "some pretty heavy stresses" from being bent by the cap) did not return to its original condition as did the insulation on the lower wires.[9] Thereafter, the deformation thus created was susceptible upon any movement (as by wind on the service or by cooling or by structure shift) to a breakthrough in the last portion of the insulation. He opined that because of the flame damage from the first fire in the area of the weatherhead and the absence of other fire or smoke at the time of the eruption of the second fire, there was no significant probability that the arcing in the weatherhead was not related to the first fire.
The testimony of the eyewitnesses to the flame damage after the first fire, together with the expert testimony as to the possible effects of flames from the window near the weatherhead and of other sources of heat on the insulation covering the bent wires in the weatherhead, support the conclusion that the first fire caused a dangerous condition which ultimately resulted in the second fire. The fact that a second fire occurred four hours later in the general area above the damage from the first fire, without any other plausible explanation for its origin, further indicates a causal relationship between the fires. Because there was flame damage above the bathroom window near the weatherhead after the first fire, as well as extensive burning of the upper interior wall opposite the weatherhead, LP & L's servicemen (with their specialized knowledge, as noted in the Hughes decision), should have realized the amount of heat to which the wires at the top of the mast had been subjected and should have known that the fire may have created a dangerous condition between the meter and the weatherhead. In the light of this constructive knowledge the servicemen's removal of the meter was not sufficient to discharge LP & L's duty to shut off the electricity to the area of the foreseeably dangerous condition which resulted in the second fire.[10]
Accordingly, the judgment of the court of appeal is reversed, and the judgment of the district court is reinstated. All costs are assessed to defendant.
NOTES
[1] The witness was referring to the window of the master bathroom and to flame damage above the window which apparently occurred when flames shot out the open window.
[2] The judge expressly rejected LP & L's theory that the second fire was the result of rekindling of the first fire.
[3] The dissenting judges opined that the disputed evidence did not involve subsequent remedial measures, but rather demonstrated LP & L's policies in effect both at the time of plaintiff's fire and at the time of the subsequent fires.
[4] The court noted there was conflicting evidence as to fire damage in the area of the breaker panel, but that this disputed fact was irrelevant, because removal of the meter had prevented electricity from flowing to the breaker panel.
[5] To further bolster this consistent policy theory, plaintiff introduced the testimony of an investigator who had been to several hundred fires annually as a fireman (in another district) and had never seen one in which LP & L terminated service other than by cutting the line at the pole.
[6] The Louisiana Code of Evidence, which was not in effect at the time of trial, uses almost identical language pertaining to evidence of subsequent remedial measures. The comment to the Code states that prior Louisiana law was generally in accord with this article.
[7] Because the judgment of the court of appeal dismissed LP & L from the action, LP & L is entitled to present in this court any argument in support of the judgment which is supported by the record. La.Code Civ.Proc. art. 2133 B, as amended in 1989. It was not necessary for LP & L to apply for supervisory writs to this court in order to preserve its right to present arguments other than the one on which the court of appeal based its favorable judgment.
[8] LP & L's manager explained that cutting the line at the pole was necessary when there was damage to the service installation, but that there were other reasons which sometimes dictated the decision to terminate service in this manner.
[9] He identified the sources of heat, stating that heat traveled by convection from the flames coming out the bathroom window ("a foot or so away" from the weatherhead), by convection from gases rising through the mast, by conduction through the mast, and by conduction through the wall.
[10] While the evidence favoring a conclusion of constructive knowledge here was not as strong as the burned and charred fuse in the Hughes case, there was sufficient evidence to support such a conclusion.