GUIDRY, Judge.
Defendant, Louisiana Power and Light Company (hereafter LP & L), appeals a judgment of the trial court finding LP & L responsible in the death of Huey R. Lott and awarding damages to his survivors. We reverse.
The facts of the case and its procedural posture at the time of trial were accurately and succinctly set out by the trial judge in his reasons for judgment as follows:
“This case involves a claim for damages by the widow and children of HUEY R. *719 LOTT. The accident giving rise to the death of MR. LOTT occurred on August 29, 1977. Suit was brought on October 19,1977, and the record has become voluminous from the filings. However, by the time the matter was tried on the merits the only remaining parties were the wife of the deceased, SYLVIA LOTT BUCKLEY, and his children, HARDTNER R. LOTT and CONSTANCE ANN LOTT (hereinafter collectively referred to as PLAINTIFFS); and LOUISIANA POWER AND LIGHT COMPANY (hereinafter referred to as DEFENDANT or LP & L).
The accident in which MR. LOTT was killed occurred in the early afternoon hours of August 29, 1977. He was making a routine check of equipment on the Urania No. 3 lease in LaSalle Parish. The lease was operated by his employer, Smith Operating, Inc. MR. LOTT was an oilfield pumper whose task was to service many different oilfield locations and pumping units. He was killed in the performance of his employment duties when he came in contact with either an energized switchbox or energized guy-wire at the Urania No. 3 lease. It is not known exactly what happened to cause LOTT’S death but it appears that the switchbox on the lease location became energized when the insulation on the wires from the conduit going into the switchbox eroded, thus causing a short. The guy-wire became ‘hot’ because it was wrapped around the metal conduit leading to the switchbox. The switchbox was not grounded.
The well where the accident occurred is one of many operated in LaSalle Parish by Smith Operating, Inc. All of these wells require electricity for operation. In this particular case, the electrical power was supplied by the DEFENDANT. However, LOUISIANA POWER AND LIGHT COMPANY did not supply the electricity directly to the well site, but rather provides a source on its main line from which Smith Operating, Inc. supplied its well. The service to the Smith Operating, Inc. lease is reflected by the diagram designated as LP & L No. 1 attached to the deposition of Dudley J. Bertrand. [See Appendix 1] As can be seen from that diagram, the accident occurred more than 800 feet from the point of delivery of electricity from DEFENDANT to Smith Operating, Inc.
The initial electrical service to this location was provided by DEFENDANT in September of 1967. The original applicant was LeVell and Long and the original application provided for a minimum capacity of 10 KV. The ownership of the lease changed hands often and LP & L received the following applications over the years:
1. Sklar Production Company, Inc. in November of 1968.
2. L.B. LeVell & Associates in September of 1969.
3. Nelson Oil Company in April of 1970.
Apparently Nelson Oil Company is a subsidiary of Smith Operating, Inc. as LP & L mailed its bills to Nelson in care of Smith.
Each of these applications were on a standard form furnished by LOUISIANA POWER AND LIGHT COMPANY....
[[Image here]]
There is no evidence to show the extent of construction of feeder lines when the system was originally connected to the LP & L system in 1967. It is apparent that some lines were added since that time. At the time of the accident, the feeder system originated from the main LP & L line which carried 13,800 volts of power. The electricity passed through a three phase Delta transformer bank which was attached to the LP & L pole. From this point the electric current was carried by a four wire system over two poles for approximately 390 feet. The fourth wire ceased to exist past the second pole and the three remaining wires continued an additional 435 feet to the point of the accident. The three wires were all power conductors of electricity. These lines carried a power of 480 volts as measured from one conductor to the other, having been reduced to that vol *720 tages by the transformer at the LP & L pole.
The system belonging to Smith Operating, Inc. was obviously grossly defective in construction and maintenance. The electrical power for this system came directly from LOUISIANA POWER AND LIGHT COMPANY. At the service entrance of the feeder system from the main LP & L line there existed an obvious violation of the National Electric Code (N.E.C.) and of DEFENDANT’S own service standards and regulations.”
The obvious violation of the N.E.C., referred to by the trial judge, consisted of the LP & L service lines through the weatherhead to the customer’s meter being contained in the same raceway or conduit as the customer’s lilies which left the electric meter and subsequently exited the same weatherhead. N.E.C. regulations require the incoming utility’s wires and the outgoing customer’s wires to be in separate conduits. However, it should be noted that N.E.C. regulations do not apply to utilities, but only to the customer’s side of the utility service entrance.
The basis for the trial court’s judgment in favor of plaintiffs is set forth in its reasons as follows:
"... that DEFENDANT was aware, or should have been aware, of the defect at the service entrance to the system and thereby was placed on notice of the potential defects in its customer’s system. With such notice DEFENDANT should have refused to furnish service until it was satisfied the system was safe.”
The trial judge further found that LP & L’s conduct was a cause-in-fact of the accident because, under the circumstances, i.e., knowledge (whether actual or presumed) of a defect in Smith’s wiring at the point of delivery, gave rise to a duty on the part of LP & L to inspect Smith’s complete system for further deficiencies before supplying power to the site; and, that said duty encompassed the risk encountered by Huey R. Lott.
On appeal, appellant lists fourteen assignments of error. Since we determine that the trial court clearly erred in its aforestated conclusion, we need consider only that issue.
The trial judge found that LP & L owed a duty to inspect Smith’s entire system for deficiencies before supplying power to the site and that its failure to do so was a cause-in-fact of Lott’s death. In reaching this conclusion, the trial court relied primarily on the holding in Hughes v. Louisiana Power and Light Company, 94 So.2d 532 (La.App. 1st Cir.1957). We find the trial court’s reliance on Hughes misplaced. In Hughes, lightning struck a transformer belonging to defendant, knocking out plaintiff’s power. The burnt transformer, which served only plaintiff’s premises, was replaced at approximately 5:30 a.m. Shortly thereafter, defendant’s servicemen returned to plaintiff’s residence at plaintiff’s request. “On their second visit, defendant’s servicemen pried loose with pliers this fuse [the fuse supplied current through plaintiff’s fuse box to his milking machine], which was burned and charred, and inserted another fuse furnished by Mrs. Hughes, following which the milking machine commenced operating. It was shortly after this [approximately ½ hour] that the fire was discovered”. Hughes, supra, at 534. The court in Hughes, supra, at 535, stated:
“The duty and responsibility of a mere generating company is generally held to be limited to making a proper connection and delivering the electric current to the purchaser’s wires and appliances in a manner which, so far as such delivery is concerned, protects life and property, and there is no duty of inspection to see that the purchaser’s wires and appliances are in a safe condition and kept so. Accordingly, where wiring or other electrical appliances on private premises are owned and controlled by the owner or occupant of such premises, a company which merely furnishes electricity is not responsible for the insulation or condition of such wiring or appliances and is not liable for injuries caused by their defective condition, to such owner or occupant, * * *. [However,] ‘knowledge of the defective and dangerous condition of a cus *721 tomer’s appliances will charge even a mere generator and supplier of electricity with liability for consequences, where current is thereafter supplied to such defective and dangerous appliances, in which case it is the energizing of the line with knowledge of the conditions, and not the conditions themselves, which forms the basis of liability’, 29 C.J.S., Electricity, § 57, pp. 611-613. See also 18 Am.Jur.Verbo ‘Electricity’, Sections 46-53, 62, 85, 100.
[[Image here]]
[Liability herein is imposed ... not upon defendant’s failure to inspect the customer’s wiring, but upon its resuming electric service with actual or presumed knowledge that due to lightning damage plaintiff’s wiring was or might be in a dangerous condition.”
The holding of the court in Hughes was most succinctly stated in its per curiam on rehearing:
“If the power company knows or should know of defects in a private wiring system or appliances which will cause damage, it is negligence on the power company’s part to energize the system, although ordinarily in the absence of such actual or constructive knowledge the power company’s duty terminates at its meter. (See authorities cited in our original opinion.)” (Emphasis ours); Hughes, at 537.
In the case at bar there is no evidence which even suggests that LP & L had knowledge of any defect in its customer’s wiring or appurtenances which, if power was not interrupted, would cause damage. On the contrary, the system had been operating for ten years without any unusual problems. All the experts who testified agreed that the N.E.C. violation at the power drop had nothing to do with Lott’s death. An LP & L spokesperson, Roscoe Holcomb, the district manager, stated that at some time after the connection in question was installed, LP & L’s requirements for service drops changed and it is now required that the customer’s wires be in a separate conduit from the company’s. Holcomb further stated, however, that LP & L did not and does not now require that existing installations of the old type be replaced as the utility company does not consider these installations hazardous.
We find this case controlled by the rationale espoused in the cases of Vital v. Housing Authority of the City of New Iberia, 360 So.2d 1182 (La.App. 3rd Cir.1978), and Jensen v. Central Louisiana Electric Company, Inc., 457 So.2d 287 (La.App. 3rd Cir.1984), writ denied, 460 So.2d 1048 (La.1984). In both of the above cases fathers of boys, who were shocked when antennas which they were handling came in contact with city housing authority owned and maintained transmission lines, sought damages from Central Louisiana Electric Company, Inc. (CLECO), the utility company who supplied power to the respective housing authorities. A panel of this court, in Jensen, supra, at 290, stated:
“A very similar set of circumstances was presented to this court in the case of Vital v. Hous. Auth. of City of New Iberia, 360 So.2d 1182 (La.App. 3rd Cir.1978).
[[Image here]]
On appeal the plaintiffs contended that CLECO, through its employees, knew or should have known that there were many television antennae in the project in close proximity of the uninsulated electric lines and that CLECO was negligent in furnishing power when it knew or should have known of these hazardous conditions.
This court affirmed the trial court which granted the motion for summary judgment, stating that:

‘mere knowledge by CLECO employees, as stated in plaintiffs’ opposing affidavit, that TV antennas in the project were ‘in close proximity’ to uninsulated electric wires, would not be knowledge of a condition which is clearly an immediate danger of injury sufficient to charge the power company with the duty to de-energize the line. The presence of TV antennas ‘in close proximity’ to uninsulated electric wires is not a hazard unless an antenna contacts a wire. 
*722
Wherever there is electric power, there is always a certain amount of danger. But the social utility of the electric power must he balanced against its hazard. See the full discussion of these theories of negligence in Allien v. Louisiana Power & Light Company, 202 So.2d 704 (La.App. 3rd Cir.1967).

‘To hold power companies liable wherever any of their employees know of a condition on a customer’s premises which could possibly result in injury would place an unreasonable burden on them as to conditions which they did not cause, and over which they have no control except to cut off the power. ’
This same reasoning applies to the case at hand. The mere knowledge by CLECO of the presence of antennae and tree limbs near the power lines, owned and maintained by the Housing Authority, would not be knowledge of a condition which is clearly an immediate danger of injury sufficient to charge CLE-CO, the supplier, with the duty to de-en-ergize the line.
The evidence is clear that CLECO was only a supplier. The Housing Authority designed and constructed the power lines within the project and had full responsibility for the maintenance of same. Under the ruling in Vital and the facts of this case, CLECO could not be liable for the injuries received by plaintiff’s son.”
Likewise in this case, LP & L was only a supplier. Smith, or one of its predecessors, designed, constructed and maintained the system. The code violation at the service drop was acceptable when it was installed and it presented no immediate danger to anyone, and played no part in the accident which took Lott’s life. The accident occurred over 800 feet from the LP & L service drop and involved customer installations. These facilities were constructed by and were under complete control of Smith. The benign condition at the service drop, which had existed for over ten years, was not such a condition posing an immediate danger of injury sufficient to charge LP & L with the duty to de-energize the line and inspect Smith’s facilities. The trial court’s conclusion to the contrary was clear error.
Accordingly, for the reasons expressed herein, we reverse the judgment of the district court and render judgment in favor of defendant, Louisiana Power and Light Company, dismissing plaintiffs’ demands with prejudice. Costs of this appeal are assessed against plaintiffs.
REVERSED AND RENDERED.
*723 APPENDIX 1
[[Image here]]