571 So.2d 672 (1990)
Charles CALHOUN, et al., Plaintiffs-Appellees,
v.
FEDERATED RURAL ELECTRIC INSURANCE COMPANY, et al., Defendants-Appellants.
No. 89-176.
Court of Appeal of Louisiana, Third Circuit.
December 5, 1990.
Rehearing Denied January 16, 1991.
*675 Kelly & Salim, Donald G. Kelly, Natchitoches, for plaintiffs-appellees.
Lunn, Irion, Johnson, Salley & Carlisle, Brian D. Smith, Shreveport, for defendants-appellants.
Before FORET, DOUCET, LABORDE, KNOLL and KING, JJ.
LABORDE, Judge.
This is a wrongful death action. Plaintiffs, Charles and Barbara Calhoun, instituted this suit against defendants, Valley Electric Membership Corporation, Inc., (VEMCO) and Federated Rural Electric Insurance Corporation for damages arising out of the electrocution of their five year old son, Cedric. A jury trial of this matter was held on August 1st through 4th, 1988. After deliberation, the jury found Mr. Calhoun to be 50% at fault and defendants to be 50% at fault. No liability was assessed to Mrs. Calhoun. The jury awarded plaintiffs $100,000.00 each. A final judgment was signed by the trial judge on August 11, 1988, which reduced Mr. Calhoun's award in accordance with the percentage of fault assigned to him. The judgment also cast defendants for all costs, including expert witness fees of $2,400.00 for plaintiffs' expert witness, Charles Kirsch, and $6,999.18 for plaintiffs' expert witness, Robert Briggs. Defendants now appeal raising several specifications of error. We reverse the trial court's award of expert witnesses fees and remand to the trial court for a contradictory hearing on the assessment of such fees. In all other respects, the judgment of the trial court is affirmed.

FACTS
Sometime in late 1979 or early 1980, Charles Calhoun purchased a used mobile home as a residence for his family. The mobile home was placed on a site in rural Natchitoches Parish, Louisiana. Since the Calhouns were moving from a nearby community, Barbara Calhoun telephoned VEMCO to arrange to have electrical service transferred to the new location. In order to bring electrical service to the mobile home, Charles Calhoun and his father erected a utility pole to serve as a meter loop pole. Mr. Calhoun then retained the services of Wise McFerrin, an electrician, to install the electrical equipment on the pole. The evidence establishes that Mr. McFerrin installed a weatherhead, meter base, circuit breaker box, ground and a receptacle.
A VEMCO construction crew, headed by Basil Maroney, went out to the site and erected two primary line poles. After the primary line poles were in place, a service line was run to plaintiffs' meter loop pole. Mr. Maroney testified that the service line was not energized on that day because the meter loop pole did not meet VEMCO height requirements. He further stated that VEMCO requires that a meter loop pole be at least twelve feet above the ground and that plaintiffs' pole was only about half that high. Plaintiffs subsequently had a meter loop pole of sufficient height erected.
After an adequate meter pole was installed, a VEMCO lineman, Alan Lewis, was sent to connect plaintiffs' service. Although there is some discrepancy in the testimony as to whether or not the mobile home was on the site when the line was energized, Mr. Lewis testified that he knew the meter loop pole was to service a mobile home. Prior to energizing the line, Mr. Lewis checked the meter loop pole to make sure it met VEMCO's requirements regarding pole height, wire size and grounding device. Mr. Lewis also checked whether the meter loop had been completed into the breaker box. Although the mobile home was not connected to the meter loop pole at the time, Mr. Lewis stated that he assumed that it would be "wired in permanently," i.e. that the lead from the mobile home would be wired directly into the breaker box underneath the separate breakers.
*676 Sometime after the electric line was energized by Mr. Lewis, Mr. Calhoun connected the mobile home to the receptacle located on the meter loop pole by means of an extension cord he purchased from an Otasco store. The extension cord was plugged into the receptacle and run over the roof of the mobile home, where it was plugged into a "pig tail" cord which extended from the mobile home. This extension cord supplied electricity to the mobile home from January 2, 1980 to July 22, 1983, which was the day of the accident.
On July 22, 1983, Cedric Calhoun was playing outside the mobile home with his siblings. Although the events leading up to the accident are not entirely clear, it appears that somehow Cedric's body came in contact with the side of the mobile home, and when this happened an estimated 120 volts of electricity coursed through his body. Cedric collapsed and was subsequently rushed to the hospital where he was pronounced dead by electrocution.
The Natchitoches Parish Sheriff's Office and VEMCO conducted an investigation, following this tragic accident. A voltage test revealed that the metal skin of the mobile home was energized with approximately 120 volts of electricity. When the metal skin was pried loose and peeled back in the area where the electrocution occurred, exposed wires were visible.
Experts at trial opined that there were two ways in which the outer skin of the mobile home could have become energized. One way involves the uninsulated wires found under the outer skin of the mobile home. These bare wires could have come in contact with the outer covering, when Cedric's body ran into the side of the mobile home. The contact of the metal covering with the wire could have caused the outer skin of the mobile home to become energized. The second way in which the mobile home could have become energized involves the grounding at the home. The mobile home contained a ground wire which was connected to the outer skin. The mobile home, itself, was not grounded. Depending on how the prongs on the extension cord were inserted into the "pig tail" cord, the ground within the mobile home could have become hot, thus energizing the outer skin.
Testimony at trial established that the equipment on plaintiffs' meter loop pole and the connecting extension cord violated several National Electric Code (N.E.C.) requirements. The N.E.C. is a safety code which applies to the consumer of electricity and his electrical equipment. The N.E.C. violations noted by plaintiffs' experts included:
(1) the absence of a 40 or 50 amp. circuit breaker inside the breaker box on the meter loop pole.
(2) the absence of a proper receptacle for the electric feeder line running from the meter loop pole to the mobile home.
(3) the absence of a proper feeder line rated at 40 or 50 amps.the extension cord used was inadequate.
(4) the receptacle mounted on the meter loop pole was housed in an indoor cover as opposed to an outdoor cover; and
(5) the absence of a ground fault circuit interrupter on the receptacle on the meter loop pole.
Plaintiffs' experts stated that the N.E.C. code violations were what ultimately caused the mobile home to become energized, and, accordingly, led to Cedric Calhoun's death. The experts also conceded that the N.E.C. had not been adopted by the Natchitoches Parish Police Jury. Except for within the city limits of Natchitoches, there was no official procedure for the installation or inspection of residential electrical systems.
While the evidence does establish that there were violations of the N.E.C. in the plaintiffs' electrical equipment, there is no evidence which would tend to show that there were any violations of the National Electric Safety Code (N.E.S.C.), the recognized safety code which applies to utilities and their equipment. Stated in other words, there was no testimony at trial which would establish that there were violations or defects in the equipment owned and operated by VEMCO.

*677 ASSIGNMENTS OF ERROR
Defendants appeal the judgment of the trial court based on nine assignments of error:
(1) the trial judge erred in making improper comments on the evidence in the presence of the jury;
(2) the trial judge erred in overruling defendants' objection to plaintiffs' requested jury instructions;
(3) the trial judge erred in denying defendants' requested jury instructions;
(4) the jury committed manifest error in finding that the death of Cedric Calhoun was caused by the negligence of VEMCO;
(5) the trial judge erred in denying defendants' motions for direct verdict;
(6) the jury committed manifest error in finding Barbara Calhoun free from fault;
(7) the jury committed manifest error in limiting Charles Calhoun's liability to 50%;
(8) the jury abused its discretion in awarding plaintiffs' excessive damages; and
(9) the trial judge's taxing of expert witness fees was improper.

IMPROPER COMMENTS ON THE EVIDENCE
Louisiana Code of Civil Procedure Article 1791 provides that:
"The judge in the presence of the jury shall not comment upon the facts of the case, either by commenting upon or recapitulating the evidence, repeating the testimony of any witness, or giving an opinion as to what has been proved, not proved, or refuted."
The reasons given by a trial judge in a jury's presence for his rulings on objections, for admitting or excluding evidence, or explaining the purpose for which evidence is offered or admitted, are not objectionable as comments or expressions of an opinion on the evidence provided that they are not unfair or prejudicial to the party complaining. Oh v. Allstate Insurance Co. 428 So.2d 1078 (La.App. 1st Cir.1983) Additionally, the trial judge has the responsibility to avoid confusing the jury and the right to use whatever semantics may be appropriate for this purpose. Kolmaister v. Connecticut General Life Insurance Co., 370 So.2d 630 (La.App. 4th Cir.), writ denied, 373 So.2d 531 (La.1979).
Defendants contend that the trial judge impermissibly commented on the evidence twice during the course of the trial of this matter. Defendants claim that the first instance of this occurred during defense counsel's cross-examination of Mr. Calhoun on whether he obtained any permits or used any escort vehicles to transport the mobile home. When asked by the trial judge what the relevance of that particular line of inquiry was, defense counsel asserted that the question was utilized in an effort to determine whether the vehicle was a mobile home or a recreational vehicle. The trial judge terminated this line of questioning stating that how Mr. Calhoun brought the structure to the site was irrelevant.
We agree with the trial judge that this line of questioning was irrelevant and would tend to confuse the jury. VEMCO's own documentation indicates that the connection was for a mobile home and not a recreational vehicle. Furthermore, Alan Lewis, the VEMCO employee responsible for energizing the line, stated that he knew that the service was for a mobile home.
The second time defendant objected to an alleged statement on the evidence occurred during defense counsel's direct examination of its expert witness, Rick Brooks. Mr. Brooks was being questioned by defense counsel on whether the N.E.C. can be waived or modified by the governmental authority adopting it. The trial judge again interrupted to inquire what the relevance of the questioning was when the fact that Natchitoches Parish had not adopted the N.E.C. had been very well established by prior testimony.
We agree with the trial judge that this testimony was redundant and added nothing to the case. The trial judge was correct in cutting off defense counsel's questioning on this subject.
*678 We do not find that on either of these occasions did the trial judge impermissibly comment on the evidence. It should also be noted that during the trial the trial judge instructed the jury that only the testimony of the witnesses was to be considered and that the comments that he or the attorneys made were to be disregarded. The charges were sufficient and the comments made by the judge did not amount to reversible error.

JURY INSTRUCTIONS
In separate specifications of error, defendants contend that the trial judge committed error in refusing to give several jury instructions requested by defendants and in overruling defendants' objections to several of plaintiffs' requested jury instructions. All of the jury instructions in contention concern the applicable standard of care. Defendants argue that the instructions given by the trial judge on the standard of care were inadequate and served to confuse or mislead the jury. Defendants would have this court reverse the trial judge and conduct a de novo review of the evidence.
Adequate jury instructions are those which fairly and reasonably point up the issues and which provide correct principles of law for the jury to apply to those issues. The adequacy of jury instructions must be determined in light of the jury instructions as a whole. Evangeline Farmers Cooperative v. Fontenot, 565 So.2d 1040 (La.App. 3d Cir.1990); Kaplan v. Missouri-Pacific Railroad Co., 409 So.2d 298 (La.App. 3d Cir.1981). The trial judge is under no obligation to give any specific jury instructions that may be submitted by either party; he must, however, correctly charge the jury. Oatis v. Catalytic, Inc., 433 So.2d 328 (La.App. 3d Cir.), writ denied, 441 So.2d 210, 215 (La.1983). An appellate court must exercise great restraint before overturning a jury verdict on the suggestion that the instructions were so erroneous as to be prejudicial, Cuccia v. Cabrejo, 429 So.2d 232 (La.App. 5th Cir.), writ denied, 434 So.2d 1097 (La.1983).
Defendants' requested jury instruction No. 10 was refused by the trial judge. This jury instruction contained the following language:
"Operators of power lines are not required to anticipate every possible accident which may occur and are not the insurers of safety of persons moving around power lines in the course of everyday living."
As for the first part of his requested instruction, we find that it was covered when the trial judge charged the jury that "[a]n electric utility is not required to guard against situations which cannot be reasonably expected or contemplated." Regarding the portion of the instruction which deals with "persons moving around power lines," the trial judge properly refused to read this because, as he noted, this is not a case concerning power lines. We think that this part of the requested charge would have only served to confuse the jury and, therefore, the trial judge did not err in refusing to read it.
Defendants also claim that the trial judge erred in not reading their proposed instruction No. 11. This orally proposed instruction provided that:
"As a general rule, there is no duty of an electric utility company to inspect its customer's equipment."
This language appears in Vital v. Housing Authority of City of New Iberia, 360 So.2d 1182 (La.App. 3d Cir.1978). Although we acknowledge that this jury instruction is a correct statement of the law, we find that it was encompassed by the trial judge's charge to the jury that:
"Where wiring or other electrical appliances on private premises are owned and controlled by the owner or occupant of the premises, a company which merely furnishes electricity is not responsible for the insulation or condition of such wiring or appliances and is not liable for injures caused by their defective condition, to such owner or occupant. However, if the power company's knows or should know of defects in a private wiring system or appliances which will cause damage, it is negligence on the *679 power company's part to energize the system, although ordinarily in the absence of such actual or constructive knowledge the power company's duty terminates at its meter."
We find this to be an accurate statement of the law and that it adequately addresses the substance of defendants' proposed jury instruction.
Defendants' remaining objections to the jury instructions given by the trial judge all involve the issue of whether an electric company has a duty to de-energize its line when it has constructive knowledge of defects in its customer's equipment. Defendants argue that the law only holds an electric company to actual knowledge of defects in its customer's equipment, and, thus, any of the jury charges which included a constructive knowledge element are misstatements of the law.
After carefully examining the jurisprudence, we have come to the conclusion that a utility company may be charged with the duty to de-energize its lines when it knows or should know that defects in a private wiring system will cause damage. In Hughes v. Louisiana Power and Light Co., 94 So.2d 532 (La.App. 1st Cir.1956), an electric utility company was held liable for a barn fire which was caused by damaged wiring in the barn. The court found that the electric company was negligent for energizing the line when it knew or should have known that due to lightning damage, the barn wiring was or may have been in a dangerous condition. The court in a per curiam rehearing set forth the applicable standard of care in the following terms:
"If the power company knows or should know of defects in a private wiring system or appliances which will cause damage, it is negligence on the power company's part to energize the system, although ordinarily in the absence of such actual or constructive knowledge the power company's duty terminates at its meter." [Emphasis added]
Hughes, at 537. This language was recently cited in a case decided by this court, Lott v. Louisiana Power and Light Co., 539 So.2d 718 (La.App. 3d Cir.), writ denied, 547 So.2d 359 (La.1989); however, the Hughes case was factually distinguished in Lott. Furthermore, in a case involving an electrocution caused by a power line owned by a sand and gravel producer, Sibley v. Gifford Hill and Co., Inc., 475 So.2d 315, 319 (La.1985), the Louisiana Supreme Court stated that:
"Of course, LP & L, as a public utility company engaged in the distribution of electricity, had a duty not to supply power across a private transmission line which it knew or should have known was unreasonably dangerous". [Emphasis added]
On the authority of these cases, we hold that the trial judge did not err in instructing the jury that defendants could be held liable for energizing or for failing to de-energize the power line when VEMCO had actual or constructive knowledge of defects in plaintiffs' wiring system.[1]
Defendants also challenge the definition of knowledge which the trial judge imparted to the jury. The definition contained the following language:
"Notice of a defect, in order to charge an electric company with liability therefore, need not be direct and express; it is enough that the defect has existed for such a length of time that is should have been known, and the presence of a conspicuous defect or dangerous condition of the appliances which has existed for a considerable length of time will create a presumption of constructive notice thereof."
*680 Defendants allege that there is no authority for the proposition under Louisiana law. We note that this definition was included in plaintiffs' requested jury instructions and that its source was listed as 26 Am.Jur.2d 331; however, we have located a similar definition in the case Gayle v. Department of Highways, 205 So.2d 775, 780-1 (La.App. 1st Cir.1967), writ denied, 251 La. 932, 933, 207 So.2d 538, 539 (1968):
"One is presumed to have constructive notice of a defect or dangerous condition when it is shown to have existed for such a long period of time that knowledge thereof can be presumed, or that it can be said that one ought to have had knowledge of the condition."
Thus, we determine that there was sufficient authority for this jury instruction.

LIABILITY OF VEMCO
The jury found defendants 50% at fault for the death of Cedric Calhoun. Recently, in Rosell v. ESCO, 549 So.2d 840, 844 (La. 1989), the Louisiana Supreme Court made the following pronouncement regarding the appellate review standard:
"It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of `manifest error' or unless it is `clearly wrong,' and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978); Canter v. Koehring, 283 So.2d 716, 724 (La.1973). See also, Sevier v. United States Fidelity & Guaranty Co., 497 So.2d 1380, 1383 (La.1986); West v. Bayou Vista Manor, Inc., 371 So.2d 1146, 1150 (La.1979); Davis v. Owen, 368 So.2d 1052, 1056 (La.1979); Cadiere v. West Gibson Products Co., 364 So.2d 998, 999 (La.1978); A. Tate, `Manifest Error' Further observations on appellate review of facts in Louisiana civil cases, 22 La.L. Rev. 605, 611 (1962). The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Arceneaux, supra at 1333, Watson v. State Farm Fire & Casualty Ins. Co., 469 So.2d 967 (La. 1985)."
With these principles in mind, we will review the jury's liability findings.
An electric utility company is required to recognize that its conduct involves a risk of causing harm to another, if a reasonable person would do so while exercising such attention, perception of the circumstances, memory, knowledge of other pertinent matters, intelligence and judgment as a reasonable person would have. If the company has, in fact more than a minimum of these qualities, it is required to exercise the superior qualities that it has in a manner reasonable under the circumstances. Levi v. Southwest Louisiana Electric Membership Cooperative, 542 So.2d 1081 (La.1989); State Farm Fire & Casualty Co. v. Valley Electric Membership Corp., 558 So.2d 731 (La.App. 3d Cir. 1990). As aforementioned, where wiring or other electrical appliances on private property are owned and controlled by the owner or occupant, an electric company is not responsible for the insulation or condition of such wiring or appliances and is not liable for injuries caused by their defective condition; however, when the electric company has actual or constructive knowledge of the defective condition, it will be liable for the consequences when current is thereafter supplied to the defective or dangerous wiring or appliances. Hughes, supra. Stated another way, if the electric company knows or should know of a condition in a private wiring system or in appliances which will clearly cause immediate danger, it is negligence for the electric *681 company to energize the system, although ordinarily in the absence of such actual or constructive knowledge the electric company's duty terminates at its meter. Hughes, supra.
After carefully reviewing the record in this case, we cannot say that the jury manifestly erred in finding defendants to be liable for the death of Cedric Calhoun. We find that there was sufficient evidence to support the trier of fact's determination that VEMCO breached its duty to plaintiffs when it energized the line or when it failed to de-energize the line after it knew or should have known of the defects present in plaintiffs' equipment. The evidence clearly establishes that plaintiffs' equipment was not in compliance with the N.E.C. and that the child's death was caused by the defective wiring system.
From the testimony at trial, it is apparent that defendant had knowledge of the defective nature of the equipment before the lines were ever energized. Basil Maroney, a construction foreman for VEMCO, testified that his crew would not hook up service initially because plaintiffs' meter loop pole was not the required height. Mr. Maroney stated that his crew did not check whether the pole contained any other defects, but that they simply left when they ascertained that it was not tall enough. After plaintiffs erected a pole which met the height requirements, Alan Lewis, a lineman for VEMCO, went out to plaintiffs' residence in order to connect the electrical services. Mr. Lewis testified that although he proceeded to connect the service, he knew that the box housing the receptacle on plaintiffs' meter pole was not proper as it was not an allweather box. He also stated that he was aware that the outside plug did not have a ground fault circuit interrupter and that in his opinion it should have, but that he did not recall seeing these devices on utility receptacles in Natchitoches Parish before the time he energized plaintiffs' system. Mr. Lewis further informed the jury that the mobile home was not connected to the meter loop pole, although he assumed that it would be directly wired into the breaker box. Even though Mr. Lewis made this assumption, he did state that the breaker box was not properly set up for this type of connection. Finally, Mr. Lewis testified that the extension cord was not there at the time he connected the power, but if he had come upon a situation where that type of extension cord was used as a conductor from the breaker box, he would have immediately informed the customer that it posed a hazardous condition. Leo Friday, the Safety Director for VEMCO, similarly testified that he would not have energized the line, if he was on the scene and saw that the mobile home was plugged into the receptacle by the extension cord Mr. Calhoun purchased.
From the testimony of Mr. Maroney and Mr. Lewis, we determine that VEMCO should have known that plaintiffs equipment possessed certain defects and that it had a duty not to energize the line. Both of these gentlemen acknowledged that plaintiffs' equipment was inadequate and this should have served as notice to VEMCO that a hazardous situation existed. Even though Mr. Lewis testified that he was not familiar with the requirements of the N.E.C., he did state that he was aware of the fact that some of the equipment on the meter pole was not adequate. Furthermore, we do not think it was reasonable for Mr. Lewis to assume that the plaintiffs would directly wire the mobile home into the breaker box, when he knew that there were certain deficiencies present in plaintiffs' equipment.
We further determine that the jury could have reasonably found that VEMCO had constructive knowledge of the defective condition. The defects were on the premises for three and one-half years, and expert testimony revealed that they constituted an obvious immediate danger. Also, VEMCO's meter reader, Joe Grappe, went out to plaintiffs' mobile home at least once every quarter for the three and one-half year period before Cedric's death. Mr. Grappe testified that he had seen the extension cord running from the meter loop pole, although he testified that he did not feel that it was his responsibility to inspect or examine the equipment coming off the meter *682 pole. He further stated that it was not uncommon in mobile home situations to have an extension cord plugged into the pole supplying power to a power tool, but that he never went around to the back of the trailer to ascertain whether that was the case at plaintiffs' residence. Mr. Grappe told the court that he had no experience as an electrician or a lineman and that he was not familiar with N.E.C. guidelines. Also, Leo Friday testified that meter readers were not trained to look for N.E.C. violations, but they are instructed to look for such hazards as low lines, leaning or broken poles and broken meters.
Although we recognize that Mr. Grappe was not schooled in the N.E.C., we find that he should have seen the obvious and immediate danger that the extension cord posed. If Mr. Grappe would have walked around to the other side of the mobile home once in the fourteen or fifteen times he visited the plaintiffs' residence, he would have seen that the cord supplied power to the home and not an outside appliance. The fact that the cord was tacked to the pole and the fact that there was no other line feeding the mobile home should have put him on notice that it was highly unlikely that the cord was supplying a power tool Mr. Grappe was instructed to look for hazards and we think the obvious defects on plaintiffs' meter loop pole should have been seen and reported.
Defendants argue that this case should be controlled by this court's decisions in Lott, supra, Jensen, supra, Vital, supra. The Jensen and Vital cases both involved damages occurring when antennas came into contact with overhead power lines. In those cases, this court found the mere presence of antennas in close proximity to the wires was not knowledge of an immediate danger to charge the supplier of electricity with the duty to de-energize. It was recognized in both of these cases that the presence of antennas in close proximity to uninsulated power lines is not a hazard unless an antenna comes in contact with a wire. We find these cases distinguishable because they dealt with situations which only were potentially hazardous, whereas, in the instant case, plaintiffs' equipment setup posed an obvious immediate danger.
The Lott case, while more similar factually than the antenna cases, can still be readily distinguished from the case before us now. In Lott, an oilfield worker was electrocuted when he came in contact with an energy switch box or an energized guywire at a well-site owned by his employer. The evidence revealed that the employer's wiring system violated the N.E.C., in that, the incoming wire owned by the utility and the outgoing wire owned by the customer were housed in the same conduit, when they should have been in separate conduits. In the Lott case, a panel of this court found that this violation of the N.E.C. posed no immediate danger and was not the cause of the employee's death, and that the utility was not negligent in failing to de-energize the line. In contrast, in the instant matter, the evidence supports a finding that plaintiffs' equipment did pose an immediate danger and was responsible for the child's death. Additionally, in Lott, there was only one violation of the N.E.C. and it was not obvious or apparent. In this case, there were several violations which both the experts and VEMCO employees testified were apparent.

MOTIONS FOR DIRECTED VERDICT
Defendants moved for directed verdict at the close of plaintiffs' case and at the close of all of the evidence. On a motion for directed verdict the trial judge should consider all the evidencenot just the evidence which supports the non-movers' casebut in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict, then granting the motion is proper. On the other hand, if there is substantial evidence opposed to the motion, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, then the motion should be denied, and the case submitted to the jury. Boeing *683 Co. v. Shipman, 411 F.2d 365 (5th Cir.1969); Campbell v. Mouton, 373 So.2d 237 (La.App. 3d Cir.1979). The trial judge is granted much discretion in determining whether to grant a motion for directed verdict, and his decision will not be overturned in the absence of an abuse of that discretion. Hebert v. Belk Construction Co., Inc., 499 So.2d 1079 (La.App. 3d Cir.), writ denied, 501 So.2d 198 (La.1986). For reasons already expressed, we do not find that the trial judge abused his discretion in determining that reasonable men could reach different conclusions on the evidence presented. The motions for directed verdict were properly denied.

LIABILITY OF CHARLES CALHOUN
The jury assessed Charles Calhoun with 50% of the fault for his son's death. Defendants would have this court increase the percentage of fault attributable to Mr. Calhoun. In Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967, 973-4 (La.1985), the Louisiana Supreme Court set forth the following guidelines in apportioning comparative fault:
"We recognize that a standard for determining percentages of fault has not been provided by the Legislature, and we are therefore presented with an opportunity to offer guidelines as we apportion fault in this instance.15 In so doing we have looked to the Uniform Comparative Fault Act, 2(b) and Comment (as revised in 1979),16 which incorporates direction for the trier of fact. Section 2(b) provides:
In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed.
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties."
[footnotes omitted]
Testimony at trial established that Mr. Calhoun hired Wise McFerrin to install the electrical equipment on the pole. Mr. Calhoun apparently never received any instructions on how to connect the mobile home to the meter loop pole. All of the equipment on the meter loop pole which was alleged to be defective, including the extension cord, was owned by Mr. Calhoun. Mr. Calhoun was also informed by his daughter that she received a shock when she went out the door of the mobile home but stated that she did not seemed alarmed about it, and after investigations revealed nothing out of the ordinary, he felt no need to call an electrician. Mr. Calhoun dropped out of school in the eleventh grade and has worked as a laborer his entire life. He testified that he has had no special training or experience with electricity or electrical equipment. Considering these factors, we find no manifest error in the jury's apportioning 50% of the fault to Charles Calhoun.

LIABILITY OF BARBARA CALHOUN
Defendants claim that the jury erred in finding Barbara Calhoun free from fault. They point out that Mrs. Calhoun testified that she received a shock while washing the dishes. They also point out that the emergency room report contains a statement allegedly made by Mrs. Calhoun that members of the Calhoun family received shocks when they stepped out the door of the mobile home onto wet ground. Mrs. Calhoun testified that she could not remember if she made the statement or not. On this evidence, defendants assert that Mrs. Calhoun had a duty to call an electrician *684 and it was negligent for her not to do so. We do not agree. Mrs. Calhoun has a ninth grade education and possesses no special knowledge concerning electricity. She had nothing to do with the purchase or installation of the deficient equipment. We do not think the fact that she was shocked was enough to charge her with the duty to call an electrician or investigate the cause of these shocks herself. The jury did not err in finding no negligence on the part of Barbara Calhoun.

DAMAGES
The jury awarded the plaintiffs $100,000.00 each for the wrongful death of Cedric Calhoun. Defendants contend that these awards are excessive and amount to an abuse of discretion. An appellate court can only disturb an award made by the trial court if it finds an abuse of discretion. Reck v. Stevens, 373 So.2d 498 (La.1979). Where there is an abuse of the trial court's discretion, the scope of review is limited to lowering or raising the award to the lowest or highest point which is reasonably within the discretion afforded that court. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976).
Cedric Calhoun was five years old when he died. He was the oldest son in a family consisting of four other children. Both parents testified that they shared a close and loving relationship with their son and that they are having a difficult time accepting his death. In fact, Mr. Calhoun testified that ever since the death of their son, they have been unable to return to the mobile home. Although we find these awards to be on the high side, we cannot say that, under the circumstances, the jury abused its discretion. See Lemire v. New Orleans Public Service, Inc., 538 So.2d 1151 (La.App. 4th Cir.), writ denied, 543 So.2d 2 (La.1989) and 542 So.2d 1383 (La. 1989); Moreau v. State, Through DOTD, 527 So.2d 1221 (La.App. 3d Cir.1988); Douget v. Allen Parish Police Jury, 520 So.2d 813 (La.App. 3d Cir.1987).

EXPERT WITNESS FEES
Finally, we consider defendants' argument that the trial judge failed to follow the procedures of LSA-R.13:3666(B) in assessing expert witness fees. This statute provides in relevant part that:
"B. The court shall determine the amount of the fees of said expert witnesses which are to be taxed as costs to be paid by the party cast in judgment either:
(1) from the testimony adduced upon the trial of the cause, the court shall determine the amount thereof and include same or,
(2) By rule to show cause brought by the party in whose favor a judgment is rendered against the party cast in judgment for the purpose of determining the amount of the expert fees to be paid by the party cast in judgment, which rule upon being made absolute by the trial court shall form part of the final judgment in the cause."
There was absolutely no testimony by either of plaintiffs' experts as to their hourly rate or the amount of time spent preparing to give their opinions. Subsequent to the trial of this matter, counsel for plaintiffs' filed a pleading styled "Motion and Order to File Expert Statements." Attached to this motion were invoices from plaintiffs' two expert witness listing their respective charges. The trial judge, without contradictory motion, accepted the invoices and fixed the expert witness fee for Mr. Briggs at $6,999.18 and Mr. Kirsch at $2,400.00. We find that it was improper for the trial judge to assess the expert witness fee from plaintiffs' motion without holding a contradictory hearing. We therefore remand to the trial court with instructions to hold a contradictory hearing in order to assess expert witness fees in this case.
For the foregoing and above assigned reasons, the judgment of the trial court is reversed insofar as it assesses expert witness fees against defendants. The case is remanded to the trial court for a contradictory hearing on the assessment of expert witness fees. In all other respects, *685 the judgment of the trial court is affirmed. Defendants are cast for all costs.
AFFIRMED IN PART, REVERSED IN PART AND REMANDED.
FORET, J., concurs with written reasons.
KING, J., dissents for written reasons assigned.
DOUCET, J., dissents for reasons assigned by KING, J.
FORET, Judge, concurring.
I file this concurring opinion for the reason that I am not convinced that I agree with some of the broad statements of dutyrisk found in the majority opinion; nor do I necessarily agree with the holdings of some of the cases cited therein. However, I do concur in the result for the reason that the evidence clearly shows that neither the meter pole nor the mobile home itself was properly grounded ... a fact which could have easily been ascertained, and indeed should have been ascertained, by VEMCO before it energized the line. The failure to do so on the part of VEMCO is sufficient negligence to hold it liable. In addition, the make-shift connections which the plaintiff-husband made also should have been detected before the line was energized ... if not at the time the line was energized, at least within the three and one-half year period in which VEMCO furnished electricity to the mobile home prior to the accident.
I respectfully concur in the result.
KING, Judge, dissenting.
I dissent from the majority opinion finding that Valley Electric Membership Corporation, Inc. (hereinafter VEMCO) and its insurer, Federated Rural Electric Insurance Corporation, are liable to the plaintiffs for their damages in this electrocution case.
The Court, by its decision in this case, has imposed upon electric utility companies a legal duty to inspect a customer's entire electrical system and equipment for defects and, if this is not done, imposes liability on the electrical utility company for damages caused by such defects. I disagree with judicial imposition of such a legal duty when none existed before.
The legal duty of electric utility companies in connection with their service lines furnishing electricity to customers, as set forth in Hughes v. Louisiana Power and Light Company, 94 So.2d 532 (La.App. 1 Cir.1956) and as quoted by this Court in Lott v. Louisiana Power and Light Company, 539 So.2d 718 (La.App. 3 Cir.1989), is as follows:
"`The duty and responsibility of a mere generating company is generally held to be limited to making a proper connection and delivering the electric current to the purchaser's wires and appliances in a manner which, so far as such delivery is concerned, protects life and property, and there is no duty of inspection to see that the purchaser's wire and appliances are in a safe condition and kept so. Accordingly, where wiring or other electrical appliances on private premises are owned and controlled by the owner or occupants of such premises, a company which merely furnishes electricity is not responsible for the insulation or condition of such wiring or appliances and is not liable for injuries caused by their defective condition, to such owner or occupant, ...'" Hughes v. Louisiana Power and Light Company, 94 So.2d 532, at page 535 (La.App. 1 Cir.1956), quoting 29 C.J.S. Electricity, § 57, pages 611-613.
As stated above, a utility company's legal duty generally ends at its meter. The company is not responsible for defects in its customer's equipment. However, in Hughes, supra, the court further stated that:
"`[K]nowledge of the defective and dangerous condition of a customer's appliances will charge even a mere generator and supplier of electricity of liability for consequences, where current is thereafter supplied to such defective and dangerous appliances, in which case it is the energizing of the line with knowledge of the conditions, and not the conditions themselves, which forms the basis of liability.' 29 C.J.S., Electricity, § 57, pages *686 611-613. See also 18 Am.Jur. Verboquote of Electricity, Sections 46-53, 62, 85, 100." Hughes v. Louisiana Power and Light Company, 94 So.2d 532, at page 535 (La.App. 1 Cir.1956).
This Court has construed that statement of law to mean that:
"[W]here the power company has knowledge of a condition on a customer's premises which will clearly cause immediate danger unless the line is de-energized, then the power company has a duty to use reasonable means to do so...." Vital v. Housing Authority of City of New Iberia, 360 So.2d 1182, at page 1184 (La.App. 3 Cir.1978).
Therefore, a utility company has a duty not to energize or to de-energize its electric service lines to a customer's premises where the utility company has knowledge or should have knowledge of a condition on the customer's premises which would clearly cause immediate danger. See Jensen v. Central Louisiana Electric Company, 457 So.2d 287 (La.App. 3 Cir.1984), writ den., 460 So.2d 1048 (La.1984).
It is under this exception to the general legal duty of utility companies that the majority finds VEMCO negligent.
Our Supreme Court, in a progression of cases from Simon v. Southwest Louisiana Electric Membership Corporation, 390 So.2d 1265 (La.1980) to Washington v. Louisiana Power and Light, 555 So.2d 1350 (La.1990), has attempted to fashion the duty of the utility company to an injured plaintiff under a traditional duty-risk analysis, focusing on whether the utility company knew or should have known its electrical service lines created a risk of danger to the plaintiff, and whether the utility company acted reasonably to prevent that harm. In determining the utility company's legal duty, the Supreme Court in Levi v. Southwest Louisiana Electric Membership Cooperative, 542 So.2d 1081 (La.1989) has identified two key areas of inquiry:
"The crucial questions are (a) whether the power company was required to recognize that its conduct involved a risk of causing physical injury or loss to another in the manner of that sustained by the plaintiff, and, if so, (b) whether the possibility of such injury or loss constituted an unreasonable risk of harm. These issues are decisive under either a dutyrisk or a traditional negligence approach." Levi v. Southwest Louisiana Electric Membership Cooperative, 542 So.2d 1081, at page 1083 (La.1989).
A utility company is not legally bound to safeguard against occurrences which cannot be reasonably expected or contemplated. Simon v. Southwest Louisiana Electric Membership, supra; Bordelon v. Continental Casualty Company, 229 So.2d 761 (La.App. 3 Cir.1969), writ den., 255 La. 483, 231 So.2d 396 (1970). Though utility companies are to guard against reasonably foreseeable hazards, they are not required to anticipate every possible accident which may occur and are not the insurers of the safety of persons using electricity furnished in the course of everyday living. See, Vincent v. Southwest Louisiana Electric Membership Corp., 380 So.2d 1245 (La.App. 3 Cir.1980); Allien v. Louisiana Power and Light Company, 202 So.2d 704 (La.App. 3 Cir.1967), writ den., 251 La. 392, 204 So.2d 574 (1967).
In this case, there was no evidence presented which suggests that VEMCO knew or should have known of any defects in plaintiffs' wiring or equipment in the mobile home which, if power was energized or not de-energized, would clearly cause immediate danger. VEMCO was never notified or called out to plaintiffs' mobile home to inspect for problems though Charles Calhoun, Barbara Calhoun, and one of her children had, on prior occasions, all experienced electrical shocks while inside the plaintiffs' mobile home. In Lott, supra, the trial court found that the utility company owed a legal duty to inspect the customer's entire system for deficiencies before supplying power. Lott, supra, at page 720. This Court reversed, citing its prior holdings in Vital v. Housing Authority of City of New Iberia, supra; and Jensen v. Central Louisiana Electric Company, supra. In both Vital and Jensen, this Court affirmed the trial court's dismissal of the utility company on motions *687 for summary judgment finding that there was no knowledge known to defendants of a condition which would clearly cause an immediate danger of injury. Vital, supra, at page 1184; Jensen, supra, at page 290.
In this case VEMCO only furnished electricity to the plaintiffs' meter loop pole at plaintiffs' mobile home. There were no defects existing in any of VEMCO's equipment. Plaintiffs constructed, owned, and exercised complete control over the meter loop pole, the electrical equipment thereon, and the electrical wiring and equipment in the mobile home. There was no evidence presented that VEMCO or any of its employees were aware of any condition of plaintiff's equipment or wiring in the mobile home that would clearly cause immediate danger of injury.
The majority finds that "... VEMCO breached its duty to plaintiffs when it energized the line or when it failed to deenergize the line after it knew or should have known of the defects present in plaintiffs' equipment." (Emphasis supplied.) This finding by the majority pre-supposes that there was a legal duty on the part of VEMCO to inspect plaintiffs' electrical equipment and find such defects in plaintiffs' electrical equipment.
The majority correctly finds that "The evidence clearly establishes that plaintiffs' equipment was not in compliance with the National Electrical Code (hereinafter N.E.C.) and that the child's death was caused by the [plaintiffs'] defective wiring system." The majority finds that the VEMCO linesman, Allen Lewis, should have discovered the various N.E.C. violations which existed on plaintiffs' meter loop pole and electrical equipment and that he should have realized that energizing the electrical service lines would constitute an immediate danger of injury. However, the majority correctly finds that the N.E.C. was not applicable at the site of the accident as it had not been adopted by the Natchitoches Parish Police Jury at the time of the accident. What the majority does not state in its decision is why VEMCO had a legal duty to inspect for violations of an electrical code which was not even applicable or why VEMCO had a legal duty to enforce an inapplicable electrical code by not energizing its electric supply lines. Even had VEMCO inspected, plaintiffs' own expert, Robert Briggs, admitted that individuals would not be able to recognize that the plaintiffs' equipment on the meter loop pole did not comply with the N.E.C. Leo Friday, the safety director of VEMCO, testified that linesmen such as Lewis are not trained in the N.E.C. He stated that the National Electric Safety Code (hereinafter N.E.S.C.) is the linesman's "Bible". There was no evidence of violations of the applicable N.E.S.C. present either when Lewis energized the line or at the time of the accident.
The majority makes much over Mr. Lewis' testimony that at the time of connection of the electrical service line to the plaintiffs' meter loop pole, that Mr. Lewis knew that the box housing the receptacle on plaintiffs' meter pole was not proper because it was not an all weather box and that he was aware that this receptacle did not have a ground fault circuit interrupter. However, these were requirements of the N.E.C. which were not applicable. Finally, Mr. Lewis testified, as the majority correctly finds, that the extension cord was not there at the time he connected and energized the electrical service line to plaintiffs' meter loop pole. The majority notes that Leo Friday, the safety director for VEMCO, also testified that he would not have connected and energized the electrical service line if he was at the scene and saw that the mobile home was plugged into the receptacle by the extension cord Mr. Calhoun purchased. However, their testimony does not change the uncontroverted fact that there was no extension cord present at the time of connection and energizing of the electrical service line to plaintiffs' meter loop pole. The majority does not state how it finds the plaintiffs' equipment was not sufficient other than to find that it did not comply with the requirements of the N.E.C. which were not applicable. The majority further finds that it was not reasonable, without stating why, for Mr. Lewis to assume that the plaintiffs would directly wire the mobile home into the breaker box *688 when he knew these non-applicable code violations were present in plaintiffs' equipment. Nevertheless, the majority finds that VEMCO had a legal duty to inspect plaintiffs' equipment and, had they done so, would have known or should have known that plaintiffs' equipment did not comply with an inapplicable electrical code thus imposing upon VEMCO a legal duty not to energize the electrical supply line.
In an attempt to buttress its finding of VEMCO's liability for failing to comply with a non-existent legal duty to inspect and enforce an inapplicable electrical code by not energizing its electrical service line, the majority states that VEMCO also had either actual or constructive knowledge of a defective condition on the premises of the plaintiffs which revealed what constituted an obvious immediate danger, that is, the extension cord plugged into a receptacle on the meter loop pole running to the mobile home and over the roof to the backside of the mobile home.
However, the majority never discusses how it finds that this constituted an obvious immediate danger. It was obviously not an immediate danger as the same condition persisted for over three and one-half years without an accident. The majority states "Although we recognize that Mr. Grappe was not schooled in the N.E.C., we find that he should have seen the obvious and immediate danger that the extension cord posed. If Mr. Grappe would have walked around to the other side of the mobile home once in the fourteen or fifteen times he visited the plaintiffs' residence, he would have seen that the cord supplied power to the home and not an outside appliance." Again, the majority pre-supposes a legal duty on the part of VEMCO to inspect plaintiffs' electrical equipment and find such defects in plaintiffs' electrical equipment. Grappe went to plaintiffs' mobile home once every three months for three and one-half years to read plaintiffs' meter. The only N.E.C. violations which Grappe might have seen at plaintiffs' mobile home was the existence of the extension cord running from the receptacle on the meter loop pole over the roof of the mobile home. But, Grappe stated, as far as he knew, the cord could have been plugged into anything on the other side of the mobile home such as a power tool. He stated that he never walked to the other side of the mobile home to see where the cord was plugged into the trailer. His primary concern was only to read the meter. He stated, "[a]nything beyond the meter so far as I was concerned was the customer's equipment. My primary job was to get the reading off the meter." The majority never states how Grappe's observance of the extension cord plugged into the receptacle on the meter loop pole and running over the roof of the trailer would create knowledge of an obvious and immediate danger. The only way Grappe could have determined an obvious and immediate danger of injury from this condition was to have inspected and determined what the extension cord was connected to.
As this Court stated in Vital v. Housing Authority of New Iberia, supra:
"To hold power companies liable whenever any of their employees knew of a condition on a customer's premises which could possibly result in injury would place an unreasonable burden on them as to conditions over which they did not cause, and over which they have no control except to cut off the power." Vital v. Housing Authority of New Iberia, 360 So.2d 1182, at page 1184 (La.App. 3 Cir. 1978).
What the majority has done by its decision is to impose upon VEMCO a legal duty to inspect, when none previously existed, the plaintiffs' equipment to find that it violated provisions of an inapplicable electrical code, and to then enforce the inapplicable electrical code by not energizing its electrical service line, or to inspect the condition created by the plugging of plaintiffs' electrical extension cord into the receptacle in the box on the meter loop pole, which extension cord then ran over the top of the plaintiffs' mobile home, to determine if it was, in fact, a dangerous connection to the mobile home, and to then de-energize the electrical line because of this dangerous condition.
*689 The decision of the majority imposes a legal duty, when none previously existed, upon electrical utility companies to inspect their customer's electrical equipment for electrical code violations or other dangerous conditions whenever they supply power to a customer's premises. What the majority decision does is to make the utility company an insurer of its customers if they do not make such an inspection and injury is sustained as a result of a defect in the customer's equipment.
If an electrical utility company is held to have this legal duty, they will obviously have to employ a large staff of experts to make inspections on every customer's premises to which they furnish electrical power. Obviously, this will necessitate a substantial rise in electrical rates to pay the cost of requiring electrical utility companies to determine if there is an unreasonable risk of harm from the customer's equipment which might possibly cause injury or loss. I submit that this places an unfair and unjust burden upon both electrical utility companies and their customers.
For these reasons I dissent.
NOTES
[1] Defendants rely chiefly on Jensen v. Central Louisiana Electric Co., 457 So.2d 287 (La.App. 3d Cir.), writ denied, 460 So.2d 1048 (La.1984) and Vital, supra, for the proposition that an electric company is charged with the responsibility of de-energizing the line only when it has actual knowledge of defects in its customer's equipment. Both cases state that "knowledge" of a condition on a customer's premises which will clearly cause immediate danger is sufficient to charge the electric company with the duty to de-energize. Neither Jensen nor Vital explain what type of knowledge is sufficient. We find no statement in either case which would limit "knowledge" on the part of the electric company to actual knowledge.